[No. G033649. Fourth Dist., Div. Three. Apr. 29, 2005.]

CARROLL MORRIS, Plaintiff and Appellant, v.
REDWOOD EMPIRE BANCORP et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I, III, and IV of the Discussion.

1308

1310

## COUNSEL

Lakeshore Law Center, Jeffrey Wilens; Law Office of Kenneth D. Quat and Kenneth D. Quat for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Tom Greene, Chief Assistant Attorney General, Albert Norman Shelden, Assistant Attorney General, Susan E. Henrichsen, Ronald A. Reiter and Michele R. Van Gelderen, Deputy Attorneys General, as Amicus Curiae on behalf of Plaintiff and Appellant.

Rutan & Tucker, John B. Hurlbut, Jr., Steven J. Goon and Treg A. Julander for Defendants and Respondents.

## OPINION

**ARONSON, J.**—Plaintiff Carroll Morris (Morris) appeals from a judgment of dismissal entered after the trial court sustained demurrers to his second amended complaint without leave to amend. The complaint alleged a single cause of action under the unfair competition law (UCL) (Bus. & Prof. Code, § 17200)[1] against defendants Redwood Empire Bancorp (Empire), National Bank of the Redwoods (National), Innovative Merchant Solutions (Innovative), and U.S. Merchant Systems (Merchant Systems), challenging a $150

---

[1] "The Legislature has given section 17200 et seq. no official name. Accordingly, we are now using the label 'unfair competition law.' " (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 169, fn. 2 [83 Cal.Rptr.2d 548, 973 P.2d 527] (*Cel-Tech*).)

fee charged by defendants upon termination of a credit card merchant account. In sustaining the demurrers, the trial court ruled the National Bank Act of 1864 (12 U.S.C. § 24 [Bank Act]) and associated regulations preempted Morris's unfair competition action. The court also ruled Morris did not allege facts demonstrating Empire's liability.

Although in the unpublished portion of this opinion we agree federal law does not preempt Morris's claims, we conclude the second amended complaint does not state a cause of action under the UCL. Because the court sustained the demurrers of National, Innovative, and Merchant Systems solely on federal preemption grounds, we reverse the judgment and remand to allow Morris the opportunity to plead facts stating a cause of action under the UCL. Because Morris has failed to allege facts sufficient to state any cause of action against Empire despite repeated attempts to do so, we affirm the trial court's dismissal of that defendant.

## ALLEGATIONS AND PROCEDURAL BACKGROUND

Morris is an elderly disabled man subsisting on Social Security benefits. In 2001, he was persuaded to start a "work at home" business involving grocery coupons, and named the business "Coupons-R-Us." To process customers' credit cards, Morris obtained a "merchant account."[2] Accordingly, he executed a merchant application provided by Innovative, National's registered agent. Morris also executed a merchant agreement with National, again provided by Innovative acting as the bank's agent.

The merchant agreement provided that a "discount rate" would be charged for each credit card transaction and, if Morris did not achieve a certain monthly transaction volume, the bank would assess a minimum $25 processing fee. In addition, National charged Morris a monthly $9.50 "customer service fee." The agreement continued indefinitely until terminated. Either party could terminate the agreement with 30 days' notice without cause, or immediately under certain circumstances. Although the bank could terminate the agreement without compensation to Morris, termination by Morris required payment of the minimum processing fee for the following 30-day period and a $150 termination fee. The merchant agreement became effective in April 2001. Morris quickly concluded the coupon business was a "scam," canceled the merchant agreement, and paid the $150 termination fee.

---

[2] Plaintiff does not allege the defendants had any role in persuading him to start his business, or to obtain a merchant account.

Morris filed the present action, alleging in his original complaint the termination fee constituted an illegal business practice under the UCL. Specifically, he alleged the termination fee was a liquidated damages clause under Civil Code section 1671, subdivision (b), and void because the fee was unreasonable. Morris sought relief for himself, and injunctive relief and restitution as a "private attorney general" on behalf of the general public. Morris named as defendants National and National's parent holding company, Empire.

National and Empire demurred. In response, Morris filed a first amended complaint and attached portions of the merchant agreement, along with another merchant agreement used by National. The first amended complaint reiterated the contention the termination fee was an improper liquidated damages penalty, and also contended the fee was unconscionable under Civil Code section 1670.5. National and Empire again demurred, arguing (1) the merchant agreement's termination fee provision was not a liquidated damages provision, (2) California courts should not use the UCL to regulate complex matters of economic policy, (3) the UCL claim is preempted by the National Bank Act and associated regulations, and (4) Morris failed to allege liability against Empire. The trial court sustained the demurrers with leave to amend, on preemption and the lack of allegations showing Empire's liability. Shortly thereafter, Morris filed his second amended complaint, to which demurrers were again filed and sustained on identical grounds. This time, however, the trial court did not grant leave to amend.

Shortly before the hearing on the demurrers to the second amended complaint, Morris added by Doe amendment defendants Innovative and Merchant Systems, registered agents of National, alleging they were parties to merchant agreements assessing the $150 termination fee. Innovative demurred to the second amended complaint on the same grounds as National and Empire, and additionally argued it was not liable because it was a disclosed agent of National, and was not alleged to have acted tortiously. The trial court sustained Innovative's demurrers without leave to amend on the same grounds as those of National and Empire. Merchant Systems had not yet filed any response to the second amended complaint. At the court's suggestion, Morris and Merchant Systems entered into a stipulation deeming Merchant Systems to have filed a demurrer on the same grounds as the other defendants. The trial court sustained these demurrers without leave to amend on the same grounds.

## STANDARD OF REVIEW

■ A demurrer tests the legal sufficiency of the complaint. (*Trader Sports, Inc. v. City of San Leandro* (2001) 93 Cal.App.4th 37, 43 [112 Cal.Rptr.2d 677].) Accordingly, in reviewing whether a trial court erred in sustaining a demurrer, we accept as true all facts properly pleaded along with those that might be implied or inferred from those expressly alleged. (*Marshall v. Gibson, Dunn & Crutcher* (1995) 37 Cal.App.4th 1397, 1403 [44 Cal.Rptr.2d 339].) We review the trial court's action de novo and exercise our own independent judgment whether a cause of action has been stated under any legal theory. (*Ibid.*; *Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125 [271 Cal.Rptr. 146, 793 P.2d 479].)

## DISCUSSION

### I*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### II

A. *The Termination Fee Is Not a Liquidated Damage Under Civil Code Section 1671*

■ The UCL defines "unfair competition" to include any "unlawful, unfair or fraudulent business act or practice . . . ." (Bus. & Prof. Code, § 17200.) This language is intended to protect consumers as well as business competitors; its prohibitory reach is not limited to deceptive or fraudulent acts, but extends to any unlawful business conduct. (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 209–210 [197 Cal.Rptr. 783, 673 P.2d 660].) "By proscribing 'any unlawful' business practice, 'section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable." (*Cel-Tech, supra,* 20 Cal.4th 163, 180.) In the second amended complaint, Morris alleges the termination fee runs afoul of two statutes. Specifically, he alleges the termination fee is an unreasonable liquidated damages provision in violation of Civil Code section 1671, and is unconscionable under Civil Code section 1670.5.

---

*See footnote, *ante*, page 1305.

Civil Code section 1671, subdivision (b), provides in relevant part: "[A] provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made." Absent a relationship between the liquidated damages and the damages the parties anticipated would result from a breach, a liquidated damages clause will be construed as an unenforceable penalty. (*Ridgley v. Topa Thrift & Loan Assn.* (1998) 17 Cal.4th 970, 977 [73 Cal.Rptr.2d 378, 953 P.2d 484].) The question whether a contractual provision is an unenforceable liquidated damages provision is one for the court. (*Beasley v. Wells Fargo Bank* (1991) 235 Cal.App.3d 1383, 1393 [1 Cal.Rptr.2d 446].) Although on demurrer a reviewing court ordinarily assumes as true the facts alleged in the complaint, a pleader's legal characterization of a contract is not controlling, particularly when the contract is attached to the pleading. (See *Barnett v. Fireman's Fund Ins. Co.* (2001) 90 Cal.App.4th 500, 505 [108 Cal.Rptr.2d 657].)

The $150 termination fee in the merchant agreement is not expressly denominated a liquidated damages provision. Nonetheless, as Morris correctly points out, to determine the legality of a provision, we examine its true function and operation, not the manner in which it is characterized in the contract. (See *Garrett v. Coast & Southern Fed. Sav. & Loan Assn.* (1973) 9 Cal.3d 731, 737 [108 Cal.Rptr. 845, 511 P.2d 1197] ["We have consistently ignored form and sought out the substance of arrangements which purport to legitimate penalties and forfeitures"].) The merchant agreement's termination provision reads as follows: "Any party may terminate this Agreement at any time with or without cause by providing written notice to the other parties. However, if Merchant terminates this Agreement, Bank and [Innovative] shall have thirty (30) days from date of receipt of the notice to delete Merchant's account during which time Merchant shall remain liable for all fees and charges, including any monthly minimum processing charge and a termination fee of $150.00."

Where a contract for a specified period of time permits a party to terminate the agreement before its expiration in exchange for a lump-sum monetary payment, the payment is considered merely an alternative to performance, and not a penalty. (See *Blank v. Borden* (1974) 11 Cal.3d 963, 970 [115 Cal.Rptr. 31, 524 P.2d 127] (*Blank*).) In *Blank*, the Supreme Court held a contract allowing a real property owner to terminate a listing agreement with a broker before its expiration upon the payment of a specified fee was not a liquidated damages provision because the fee was not triggered by

a breach or default under the agreement. The court noted the contract presented the owner with a true option or alternative, as follows: "[I]f, during the term of an exclusive-right-to-sell contract, the owner changes his mind and decides that he does not wish to sell the subject property after all, he retains the power to terminate the agent's otherwise exclusive right through the payment of a sum certain set forth in the contract." (*Id.* at p. 970.)

Morris distinguishes the case on the ground the merchant agreement has no termination date. Because the contract is of indefinite duration, Morris contends the merchant's cancellation is effectively a "breach" of the agreement. We are not persuaded.

█ Although a contract's characterization of a particular provision is not controlling, to constitute a liquidated damage clause the conduct triggering the payment must in some manner breach the contract. *Perdue* illustrates this point. There, the plaintiff alleged a bank's insufficient funds (NSF) fee, charged to the bank's customer whenever the customer wrote a check in an amount exceeding available deposits, was a liquidated damages provision subject to the scrutiny of Civil Code section 1671. In rejecting this contention, the court concluded, "because the depositor has never agreed to refrain from writing NSF checks, the writing of such a check is not a breach of contract." (*Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 932 [216 Cal.Rptr. 345, 702 P.2d 503] (*Perdue*).)

Similarly, Morris never agreed not to terminate the merchant agreement. Indeed, the merchant agreement *expressly* allowed Morris to terminate his performance at any time. Morris notes the lack of any specified duration in the merchant agreement makes payment of the termination fee inevitable. But this very inevitability takes the provision out of the realm of liquidated damages, which by definition are assessed only upon a breach. A merchant seeking to open an account with National knows at some point he or she must pay the $150 termination fee, and may, if desired, create a reserve against this liability. Thus, the fee is merely a deferred charge attendant to initiating the account.

Morris also argues the termination fee effectively operates as a liquidated damage when the merchant agreement is terminated upon an independent breach by the merchant, such as nonpayment of the minimum monthly service fee. This argument misses the point. It is the merchant's termination of the agreement, by whatever means, that triggers the termination fee. Because the agreement expressly allows the merchant to terminate at any time, imposition of the fee is not dependent upon any breach of contract and is therefore not a liquidated damage.

B. *Morris Has Not Alleged Facts Sufficient to Demonstrate Unconscionability Under Civil Code Section 1670.5*

As a separate and independent basis for the UCL claim, the complaint alleges the termination fee in the merchant agreement is unconscionable under Civil Code section 1670.5. We conclude Morris's factual allegations fail to state an unconscionability claim.[4]

██ Civil Code section 1670.5, subdivision (a), provides: "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." The issue whether a contract provision is unconscionable is a question of law. (*Flores v. Transamerica HomeFirst, Inc.* (2001) 93 Cal.App.4th 846, 851 [113 Cal.Rptr.2d 376] (*Flores*).)

Although "unconscionability" is a mouthful to articulate, it is far more difficult to define. The doctrine has been described as "chameleon-like" because of its flexibility and insusceptibility to black-letter definition. (*Steinhardt v. Rudolph* (Fla.Dist.Ct.App. 1982) 422 So.2d 884, 890.) Indeed, Civil Code section 1670.5 does not define unconscionability, and at least one commentator observed that "unconscionability is a concept incapable of exact definition." (Comment, *Commercial Secrecy and the Code—The Doctrine of Unconscionability Vindicated* (1968) 9 Wm. & Mary L.Rev. 1143, 1146.) The doctrine's flexibility, however necessary to its use as a judicial "safety valve" to prevent gross injustice, creates the risk courts may intervene to deprive one contracting party of his or her bargain simply because the contractual obligations of the dissatisfied party proved more burdensome than originally anticipated. In an analogous context, our high court has observed: "Courts may not simply impose their own notions of the day as to what is fair or unfair." (*Cel-Tech, supra,* 20 Cal.4th at p. 182.) "An undefined standard of

---

[4] Morris asserts the issue of whether the termination fee as alleged is unconscionable was not raised before the trial court, and thus should not be considered on appeal. We observe, however, the general rule barring new theories on appeal does not apply to appellate review of a trial court's order sustaining a demurrer. (*Smith v. Commonwealth Land Title Ins. Co.* (1986) 177 Cal.App.3d 625, 629–630 [223 Cal.Rptr. 339].) Accordingly, "[a]n appellate court may . . . consider new theories on appeal from the sustaining of a demurrer to challenge or justify the ruling." (*B & P Development Corp. v. City of Saratoga* (1986) 185 Cal.App.3d 949, 959 [230 Cal.Rptr. 192].)

what is 'unfair' fails to give businesses adequate guidelines as to what conduct may be challenged and thus enjoined and may sanction arbitrary or unpredictable decisions about what is fair or unfair." (*Cel-Tech, supra,* 20 Cal.4th at p. 185.) While constructing a precise definition of unconscionability may be difficult, certain identifiable factors, properly applied, narrow the scope of the doctrine.

■ In California, two separate approaches have developed for determining whether a contract or provision thereof is unconscionable. One, based upon the common law doctrine, was outlined by the California Supreme Court in *Graham v. Scissor-Tail, Inc.* (1981) 28 Cal.3d 807 [171 Cal.Rptr. 604, 623 P.2d 165] (*Graham*). Under *Graham,* the court first determines whether an allegedly unconscionable contract is one of adhesion.[5] Upon making this finding, the court then must determine whether (a) the contract term was outside of "the reasonable expectations of the [weaker] part[y]," or (b) was "unduly oppressive or 'unconscionable.' " (*Graham,* at p. 820.)

■ A separate test, based upon cases applying the Uniform Commercial Code unconscionability provision views unconscionability as having "procedural" and "substantive" elements. (*A & M Produce Co. v. FMC Corp.* (1982) 135 Cal.App.3d 473 [186 Cal.Rptr. 114] (*A & M Produce*).) "The procedural element requires oppression or surprise. [Citation.] Oppression occurs where a contract involves lack of negotiation and meaningful choice, surprise where the allegedly unconscionable provision is hidden within a prolix printed form. [Citation.] The substantive element concerns whether a contractual provision reallocates risks in an objectively unreasonable or unexpected manner." (*Jones v. Wells Fargo Bank* (2003) 112 Cal.App.4th 1527, 1539 [5 Cal.Rptr.3d 835] (*Jones*).) Under this approach, both the procedural and substantive elements must be met before a contract or term will be deemed unconscionable. Both, however, need not be present to the same degree. A sliding scale is applied so that "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa. " (*Armendariz, supra,* 24 Cal.4th at p. 114.)

---

[5] " 'The term [contract of adhesion] signifies a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.' " (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 113 [99 Cal.Rptr.2d 745, 6 P.3d 669] (*Armendariz*).) Adhesion contracts " 'are, of course, a familiar part of the modern legal landscape . . . . They are also an inevitable fact of life for all citizens—businessman and consumer alike.' " (*Intershop Communications AG v. Superior Court* (2002) 104 Cal.App.4th 191, 201 [127 Cal.Rptr.2d 847].)

Our Supreme Court in *Perdue, supra,* 38 Cal.3d 913, performed its unconscionability analysis exclusively under the *Graham* approach, but noted the two analytical approaches are not incompatible, declaring: "Both pathways should lead to the same result." (*Id.* at p. 925, fn. 9.) Many years later in *Armendariz,* the court approved both approaches without expressing a preference for either one. (*Armendariz, supra,* 24 Cal.4th at pp. 113–114.) In the recent case of *Little v. Auto Stiegler, Inc.* (2003) 29 Cal.4th 1064 [130 Cal.Rptr.2d 892, 63 P.3d 979] (*Little*), our high court employed exclusively the procedural/substantive approach derived from *A & M Produce.*

Each of the two approaches has generated some confusion in its application. For example, the *Graham* approach commences with a determination of whether the contract is one of adhesion, thus fostering the impression that a nonadhesion contract may never be unconscionable. In *Harper v. Ultimo* (2003) 113 Cal.App.4th 1402 [7 Cal.Rptr.3d 418] (*Harper*), however, we expressly recognized that a finding of adhesion was not a prerequisite to an unconscionability determination, and held unenforceable certain exculpatory provisions incorporated into, but not attached to, a nonadhesive contract.

Similarly, under the two-pronged "procedural" and "substantive" test of *A & M Produce,* courts often reflexively conclude the finding of an adhesion contract alone satisfies the procedural prong, and immediately move on to the subject of substantive unconscionability. (See, e.g., *Flores, supra,* 93 Cal.App.4th at p. 853 ["A finding of a contract of adhesion is essentially a finding of procedural unconscionability"].) Consequently, other procedural issues, including surprise, often are ignored when balancing or weighing procedural and substantive unconscionability. Undue reliance on any one procedural factor to the exclusion of others may produce analytical myopia and obscure the larger unconscionability picture. This problem was recognized in *California Grocers Assn. v. Bank of America* (1994) 22 Cal.App.4th 205 [27 Cal.Rptr.2d 396] (*California Grocers*), where the court criticized the *A & M Produce* approach, noting: "To speak in terms of 'procedural' unconscionability is to elevate the fact of adhesiveness, which is not per se oppressive, to the same level as 'substantive' unconscionability, thus tending to obscure the real issue." (*California Grocers,* at p. 214.)

Nonetheless, the procedural/substantive approach provides a useful framework when properly employed, and conforms more closely to cases decided under the section 2-302 of the Uniform Commercial Code, upon which California's unconscionability statute is based. (See *Perdue, supra,* 38 Cal.3d at p. 925, fns. 9 & 10.) Accordingly, we begin our analysis by considering the issue of procedural unconscionability with the following

caveat in mind: Because procedural unconscionability must be measured in a sliding scale with substantive unconscionability, our task is not only to determine *whether* procedural unconscionability exists, but more importantly, *to what degree* it may exist.

 " 'Procedural unconscionability' concerns the manner in which the contract was negotiated and the circumstances of the parties at that time. [Citation.] It focuses on factors of oppression and surprise. [Citation.] The oppression component arises from an inequality of bargaining power of the parties to the contract and an absence of real negotiation or a meaningful choice on the part of the weaker party." (*Kinney v. United Healthcare Services, Inc.* (1999) 70 Cal.App.4th 1322, 1329 [83 Cal.Rptr.2d 348] (*Kinney*).)

 In *Armendariz* the high court commenced its procedural unconscionability analysis by first determining whether the contract at issue was one of adhesion. Following *Armendariz*, we too begin our analysis of the merchant agreement by determining whether it is an adhesion contract. *Armendariz* defines an adhesion contract as " 'a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.' " (*Armendariz, supra*, 24 Cal.4th at p. 113.)

In support of its legal conclusion the termination fee is part of an "adhesion contract," the second amended complaint alleges (a) Morris is unsophisticated, (b) the merchant agreement was a "form" contract imposed upon him, and (c) the termination fee provision was not negotiated. These allegations, which we must accept as true, demonstrate the merchant agreement was an adhesion contract as defined in *Armendariz*.

 Our recognition of the merchant agreement as an adhesion contract, however, heralds the beginning, not the end, of our inquiry into its enforceability. " 'To describe a contract as adhesive in character is not to indicate its legal effect. . . . [A] contract of adhesion is fully enforceable according to its terms [Citations] unless certain other factors are present which, under established legal rules—legislative or judicial—operate to render it otherwise.' " (*Perdue, supra*, 38 Cal.3d at p. 925.)

 As noted above, courts sometimes equate "adhesion" with "oppression" in ruling that an adhesion contract is procedurally unconscionable.[6]

---

[6] Part of the problem may stem from a previous definitions of adhesion requiring the absence of alternative sources. For example, Justice Tobriner defined a contract of adhesion as one that "must be accepted or rejected by the second party on a 'take it or leave it' basis, without opportunity for bargaining *and under such conditions that the 'adherer' cannot obtain*

Although adhesion contracts often are procedurally oppressive, this is not always the case. (See *California Grocers, supra,* 22 Cal.App.4th at p. 214 [recognizing adhesiveness "is not per se oppressive"].) Oppression refers not only to an absence of power to negotiate the terms of a contract, but also to the absence of reasonable market alternatives. In *Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699 [131 Cal.Rptr. 882, 552 P.2d 1178], our state's highest court recognized the point at which an adhesion contract becomes oppressive: "In many cases of adhesion contracts, the weaker party lacks not only the opportunity to bargain but also *any realistic opportunity to look elsewhere for a more favorable contract*; he must either adhere to the standardized agreement *or forego the needed service.*" (*Id.* at p. 711, italics added.) Conversely, "the 'oppression' factor of the procedural element of unconscionability may be defeated, if the complaining party has a meaningful choice of reasonably available alternative sources of supply from which to obtain the desired goods and services free of the terms claimed to be unconscionable." (*Dean Witter, supra,* 211 Cal.App.3d at p. 772.)

Of course, not every opportunity to seek an alternative source of supply is "realistic." Courts have recognized a variety of situations where adhesion contracts are oppressive, despite the availability of alternatives. For example, a sick patient seeking admittance to a hospital is not expected to shop around to find better terms on the admittance form. (See *Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441].) Similarly, " 'few employees are in a position to refuse a job because of an arbitration agreement' " in an employment contract. (*Little, supra,* 29 Cal.4th at p. 1071.)

In the present case, Morris failed to allege he could not have obtained merchant credit card services from another source on different terms. Moreover, unlike situations where the weaker party is under immediate pressure not to seek out alternative sources, Morris was under no such compulsion in attempting to start his business. In a similar context, the court in *West v. Henderson* (1991) 227 Cal.App.3d 1578 [278 Cal.Rptr. 570] (*West*), rejected an unsophisticated tenant's claim of oppression in entering into a commercial lease for a sandwich shop: "The only oppression on [tenant] we perceive in the circumstances surrounding the signing of the lease was self-imposed. [Tenant] was not in pursuit of life's necessities; this was a business venture. Knowing her own inexperience, she signed the lease without consulting an

the desired product or service save by acquiescing in the form agreement. [Fn. omitted.]" (*Steven v. Fidelity & Casualty Co.* (1962) 58 Cal.2d 862, 882 [27 Cal.Rptr. 172, 377 P.2d 284], italics added.) Such definitions have led some courts to use the terms "adhesion" and "oppression" interchangeably. (See *Dean Witter Reynolds, Inc. v. Superior Court* (1989) 211 Cal.App.3d 758, 768–771 [259 Cal.Rptr. 789] (*Dean Witter*).) The current definition of adhesion used by our Supreme Court, however, does not include a requirement that there exist alternative sources of supply. (See *Armendariz, supra,* 24 Cal.4th at p. 113.)

attorney . . . ." (*Id.* at p. 1587.) Based on the allegations of Morris's second amended complaint, we are able to discern little oppression in the formation of the merchant agreement.

We next turn to the procedural element of "surprise." As noted above, this element unfortunately has been given short shrift by several courts analyzing unconscionability under the *A & M Produce* framework. Procedural surprise focuses on whether the challenged term is hidden in a prolix printed form or is otherwise beyond the reasonable expectation of the weaker party. (See *Jones, supra,* 112 Cal.App.4th at p. 1539; *Harper, supra,* 113 Cal.App.4th at p. 1406.)

In the present case, the second amended complaint contains no allegations that Morris was unaware of the fee when he executed the merchant agreement, or that its terms were misrepresented to him. In his brief, Morris asserts the termination fee is "buried in dense prose." We disagree. The termination fee provision is easily located in the third sentence under the large type heading "ARTICLE IV—TERMINATION AND EFFECT OF TERMINATION," and subheading "4.01 Term: Termination."[7]

That a clear heading in a contract may refute a claim of surprise was recognized in *Woodside Homes of Cal., Inc. v. Superior Court* (2003) 107 Cal.App.4th 723 [132 Cal.Rptr.2d 35], which held enforceable an arbitration provision in a home sales contract. Although the provision's type style was "small and [did] not stand out," a large type heading requiring the purchasers' initials preceded it. (*Id.* at p. 729.) Based largely on the lack of surprise due to the heading, the court in *Woodside* determined that even if the buyers had been provided no meaningful opportunity to negotiate the terms of the contract with the builder, there existed only a "low level" of procedural unconscionability. (*Id.* at p. 730.)

The present case is distinguishable from provisions found to have surprised the weaker party. For example, in *Perdue, supra,* 38 Cal.3d 913, the Supreme Court considered the effect of a $6 bank charge, or NSF fee, for processing each check drawn on accounts lacking funds sufficient to cover the amount of the check. In concluding the plaintiff presented a triable issue of fact regarding unconscionability, the court considered: (1) The NSF fee provision became effective when the depositor opened a checking account and executed

---

[7] Morris contends he can show surprise by attaching the full agreement to a future amendment to his second amended complaint, and notes the issue of unconscionability was not raised by way of demurrer in the trial court. Although we agree with Morris that he should be given a further opportunity to cure the defects in his UCL cause of action based upon unconscionability, we express no opinion as to whether attaching the approximately 18 pages of the merchant agreement would be sufficient to show surprise.

a signature card; (2) the NSF fee was not mentioned anywhere on the signature card itself, but was found in other materials not provided to the depositor; and (3) the signature itself was used in part as a handwriting exemplar, whose contractual character was not readily apparent. (*Id.* at p. 928.) Similarly, in our decision in *Harper, supra,* 113 Cal.App.4th 1402, we found surprise when a contract referenced the Better Business Bureau rules, but did not attach a copy of them. We noted a customer executing the contract would "receive a nasty shock" when he or she discovered the severe limitations on liability contained in these rules. (*Id.* at p. 1406.)

The present situation also is distinguishable from *Perdue* and *Harper* because the plaintiffs in those cases were consumers, not merchants. We recognize the concept of unconscionability applies to businesses as well as consumers. (See, e.g., *Graham, supra,* 28 Cal.3d at pp. 818–819; *A & M Produce, supra,* 135 Cal.App.3d at p. 490.) Nonetheless, the merchant agreement allowed Morris to accept credit card payments from his customers, and it is reasonable to expect even an unsophisticated businessman to carefully read, understand, and consider all the terms of an agreement affecting such a vital aspect of his business.

█ This point was recognized in *West, supra,* 227 Cal.App.3d 1578, when the court concluded that the length of a contract alone does not establish surprise. The court found the tenant had no excuse for not carefully reading the lease and understanding its terms before execution. The court warned parties to exercise care in conducting commercial transactions: "As this case demonstrates, loose business practices, such as failure to read, investigate, and negotiate a commercial contract, often impose significant and costly consequences. [Tenant] apparently saw no reason to protect her own interests at the outset. We will not do so at this late stage. *Parties to commercial contracts fail to read them at their own peril.*" (*Id.* at p. 1587, italics added.)

In sum, we are able to discern little or no procedural unconscionability from the allegations of the second amended complaint.

█ We now turn our analysis to substantive unconscionability. A provision is substantively unconscionable if it "involves contract terms that are so one-sided as to 'shock the conscience,' or that impose harsh or oppressive terms." (*24 Hour Fitness, Inc. v. Superior Court* (1998) 66 Cal.App.4th 1199, 1213 [78 Cal.Rptr.2d 533].) The phrases "harsh," "oppressive," and "shock the conscience" are not synonymous with "unreasonable." Basing an unconscionability determination on the reasonableness of a contract provision would inject an inappropriate level of judicial subjectivity into the analysis. "With a concept as nebulous as 'unconscionability' it is important that courts

not be thrust in the paternalistic role of intervening to change contractual terms that the parties have agreed to merely because the court believes the terms are unreasonable. The terms must shock the conscience." (*American Software, Inc. v. Ali* (1996) 46 Cal.App.4th 1386, 1391 [54 Cal.Rptr.2d 477]; accord *Kinney, supra,* 70 Cal.App.4th at p. 1330 [" 'Substantive unconscionability' focuses on the terms of the agreement and whether those terms are 'so one-sided as to "shock the conscience." ' [Citations.]"].)

"[I]t is clear that the price term, like any other term in a contract may be unconscionable. [Citations.] Allegations that the price exceeds cost or fair value, standing alone, do not state a cause of action. [Citations.] Instead, plaintiff's case will turn upon further allegations and proof setting forth the circumstances of the transaction. [¶] The courts look to the basis and justification for the price [citation], including 'the price actually being paid by . . . other similarly situated consumers in a similar transaction.' [Citation.] . . . While it is unlikely that a court would find a price set by a freely competitive market to be unconscionable [citation], the market price set by an oligopoly[8] should not be immune from scrutiny." (*Perdue, supra,* 38 Cal.3d at pp. 926–927.)

Morris argues the second amended complaint has adequately alleged substantive unconscionability by noting the termination fee is equivalent to six months of the minimum processing fee. We disagree. Morris has made no allegation that National's termination fee is grossly out of line with fees charged by other banks. Nor has Morris alleged any facts demonstrating the California banking industry is oligopolistic. Morris's allegation the bank incurred no costs in terminating a merchant account construes the notion of "price/cost" too narrowly. Unlike the NSF fees at issue in *Perdue,* National's assessment of the termination fee is, for Morris, a one-time event. Thus, the fee may be viewed not only as a charge to recompense the bank for its costs incurred in closing the account, but as a deferred fee for all of the services provided by the bank in opening, maintaining, and terminating the account. Morris has not alleged the bank incurred no costs in providing these services.

Moreover, looking solely to the costs incurred by the bank is myopic. In determining whether a price term is unconscionable, courts also consider the value being conferred upon the plaintiff. (*Carboni v. Arrospide*

---

[8] "An oligopoly is 'a market structure in which a few sellers dominate the sales of a product and where entry of new sellers is difficult or impossible . . . . [¶] Oligopolistic markets are characterized by high market concentration. Usually the four largest producers of a good account for over half the domestic shipments.' " (*California Grocers, supra,* 22 Cal.App.4th at p. 216, quoting Hyman, Economics (2d ed. 1992) p. 356.) We express no opinion whether Morris could plead facts alleging California's banking industry to be oligopolistic, but note in passing that, "Banks in our society are commonly most competitive." (*Copesky v. Superior Court* (1991) 229 Cal.App.3d 678, 691 [280 Cal.Rptr. 338].)

(1991) 2 Cal.App.4th 76, 84 [2 Cal.Rptr.2d 845].) From a value perspective, we are skeptical a one-time fee of $150 in exchange for affording a merchant the ability to accept customers' credit cards is so harsh or oppressive as to "shock the conscience." Although Morris's transaction with National ultimately provided no value to him, unconscionability is determined as of the time the contract was entered into, not in light of subsequent events. (*American Software, Inc. v. Ali, supra,* 46 Cal.App.4th at p. 1391.) As one court noted, "[i]t is not the province of the courts to scrutinize all contracts with a paternalistic attitude and summarily conclude that they are partially or totally unenforceable merely because an aggrieved party believes that the contract has subsequently proved to be unfair or less beneficial than anticipated." (*Geldermann & Co., Inc. v. Lane Processing, Inc.* (8th Cir. 1975) 527 F.2d 571, 576.)

Morris also argues the agreement is substantively unconscionable because it is a one-sided fee imposed only on the merchant, not the bank. This, however, does not involve the "one-sided" reallocation of risks found by courts to "shock the conscience."

An unconscionable reallocation of risks occurs when, for example, a manufacturer disclaims all warranties that the product will perform its intended functions, or precludes a buyer's recovery of consequential damages. (*A&M Produce, supra,* 135 Cal.App.3d at pp. 491–493.) In such situations, the seller shifts the risk connected with matters in its own control to the buyer, in contravention of the basic principle that the "risk of loss is most appropriately borne by the party best able to prevent its occurrence." (*Id.* at p. 491.) Imposition of the termination fee upon the merchant here does not reallocate the risk of the bargain in an inappropriate manner. The termination fee is imposed only when the merchant chooses to terminate the agreement.

Our conclusion the second amended complaint fails to allege the termination fee provision is unconscionable does not, however, end the matter. Because the unconscionability issue was not the basis for defendants' demurrers, Morris never amended his complaint to address it. Thus, Morris should be allowed the opportunity to plead facts demonstrating unconscionability in accordance with the principles discussed herein.

III, IV*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 1305.

## V

## DISPOSITION

The judgment in favor of Empire is affirmed. The judgment in favor of the other defendants is reversed and remanded for further proceedings consistent with this opinion. The parties are to bear their own costs on appeal.

Sills, P. J., and O'Leary, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 24, 2005.