Filed 10/30/14  Woods v. JFK Memorial Hospital CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| DAREL D. WOODS, | |
| Plaintiff and Appellant, | G050286 |
| v. | (Super. Ct. No. INC1205209) |
| JFK MEMORIAL HOSPITAL, INC., | O P I N I O N |
| Defendant and Respondent. | |

Appeal from an order of the Superior Court of Riverside County, John G. Evans, Judge.  Reversed and remanded.

Law Office of Joseph Antonelli, Joseph Antonelli, Janelle C. Carney, Jason Hatcher; Shanberg, Stafford & Bartz, Ross E. Shanberg, Shane C. Stafford, Aaron A. Bartz; Law Offices of Kevin T. Barnes, Kevin T. Barnes and Gregg Lander for Plaintiff and Appellant.

Littler Mendelson, Elizabeth Staggs-Wilson, Keith A. Jacoby, Henry D. Lederman and Anthony G. Ly for Defendant and Respondent.

\*          \*          \*

Defendant JFK Memorial Hospital, Inc. (JFK) employed plaintiff Darel D. Woods as a nurse beginning in September 2005. In 2012, after leaving his employment, he filed the instant lawsuit as a putative class action, alleging numerous wage and hour violations under the Labor Code. He also alleged claims under the Unfair Competition Law (UCL) and the Private Attorney General Act (PAGA). JFK moved to compel arbitration, arguing Woods had voluntarily signed an arbitration agreement. The trial court granted the motion. We agree with Woods that based on the undisputed facts the agreement was both substantively and procedurally unconscionable, and therefore reverse the court's order granting JFK's motion to compel arbitration.

I

FACTS

Woods worked at JFK as a registered nurse between September 2005 and July 2012. All of the nurses who worked at JFK during the relevant time were covered by a collective bargaining agreement (CBA) negotiated between JFK and the Service Employees International Union. Three different CBAs were in effect during the time Woods was employed. JFK is, apparently, owned by Tenet.

At the time he began working for JFK, Woods signed an "Employee Acknowledgement Form" (Acknowledgment). The Acknowledgement Woods signed was five paragraphs and approximately 540 words long. Paragraph four states: "In addition, I acknowledge that I have received and reviewed a copy of the Tenet Fair Treatment Process [FTP] brochure. I hereby voluntarily agree to use the Company's Fair Treatment Process and to submit to final and binding arbitration any and all claims and disputes that are related in any way to my employment or the termination of my employment with Tenet. I understand that final and binding arbitration will be the sole and exclusive remedy for any such claim or dispute against Tenet or its parent, subsidiary or affiliated companies or entities, and each of its and/or their employees, officers,

2

directors or agents, and that, by agreeing to use arbitration to resolve my dispute, both the Company and I agree to forego any right we each may have had to a jury trial on issues covered by the Fair Treatment Process. I also agree that such arbitration will be conducted before an experienced arbitrator chosen by me and the Company, and will be conducted under the Federal Arbitration Act and the procedural rules of the American Arbitration Association ('AAA')." The next paragraph outlines the handling of the arbitration's costs and states the arbitration agreement may not be modified except by mutual consent.

The FTP brochure is eight pages long, and outlines an extensive procedure employees must engage in before filing for arbitration. The employee must first submit the dispute to a supervisor, then appeal an adverse decision to the department head, then appeal to administration, then appeal to an "FTP Committee" prior to seeking arbitration before a neutral arbitrator at AAA.

The final three pages of the FTP include information about the arbitration process. To begin arbitration, the employee must obtain and complete an arbitration request from the human resources department. This request "will serve to confirm your and the company's prior mutual agreement to submit the dispute to final and binding arbitration." The FTP also explained certain claims were excluded, including "any non-waivable statutory claims, which may include wag[]e claims within the jurisdiction of a local or state labor commissioner. . . . This means you may file such non-waivable statutory claims with the appropriate agency that has jurisdiction over them if you wish, regardless of whether you decide to use the FTP to resolve them. However, if such an agency completes its processing of your action against the company, you must use the FTP if you wish to pursue your claim . . . ."

Additionally, the FTP stated it was to be governed by the Federal Arbitration Act (9 U.S.C. § 1 et seq.) (FAA). Discovery was to be conducted in

3

accordance with the "Employee Dispute Resolution Rules of the AAA." Representation by counsel during the pre-arbitration process was not permitted, "although both you and the company have the right to consult privately with your own counsel at any time at your own expense." Further, "[a]ll statements and information made or revealed during the FTP are confidential, and neither you nor the company may reveal any such information, except on a 'need to know' basis or as permitted or required by law."

Three different CBAs were in effect during Woods's employment, all of which included a substantially identical provision: "The parties agree that nothing in this Agreement shall affect the enforceability of any Registered Nurse's existing agreement to be bound by the Tenet Fair Treatment Process ('FTP'), including by either final and binding arbitration, under the American Arbitration Association's Employee Dispute Resolution Rules with respect to any dispute not otherwise arbitrable under the Collective Bargaining Agreement. The parties further agree that the Employer may request that any currently employed or newly-hired Registered Nurse voluntarily execute an acknowledgement form likewise agreeing to be bound by the FTP with respect to any disputes not otherwise arbitrable under this collective bargaining agreement. No retaliation or adverse action may be taken against anyone who exercises the option not to sign the FTP. . . . Nothing herein shall preclude any Registered Nurse or the Employer from seeking to challenge or enforce the FTP, including the obligation to arbitrate."

After his employment with JFK ended, Woods filed the instant case as a putative class action. He sought damages for unpaid wages and penalties (Lab. Code, §§ 204, 510, 1194, 1198), failure to pay wages as required upon involuntary separation (Lab. Code, § 200), failure to pay the meal break penalty at the proper rate (Lab. Code, §§ 226.7, 512), failure to provide accurate wage statements (Lab. Code, § 226), and failure to provide meal breaks and rest breaks (Lab. Code, § 226.7). He also sought restitution and injunctive relief under the UCL (Bus. & Prof. Code, § 17200 et seq.) for many of the

4

same issues — failure to pay proper wages and overtime compensation, failure to provide wages at the time of separation, violation of meal period provisions, and failure to provide itemized wage statements. Finally, under the PAGA (Lab. Code, §§ 2698, 2699), plaintiffs sought to recover wages and penalties, as applicable, based on largely the same underlying facts as previously alleged.

JFK filed a motion to compel arbitration, arguing Woods had agreed to arbitrate any disputes, the FTP did not expressly permit class arbitration, and the FAA, which governed the agreement, preempted state laws that might preclude enforcement. JFK also argued the PAGA claims must be arbitrated.

In support of its motion, JFK submitted the declaration of Christiane Korman, a senior human resources generalist for JFK who had held that position since March 2012. She was familiar with JFK's procedures for maintaining personnel records. She authenticated the FTP and the three relevant CBAs, which were attached to her declaration. She also stated: "I am informed and believe and on that basis state that, prior to his first day of employment, Mr. Woods was provided with a Tenet Fair Treatment Process brochure ('FTP Brochure'). Mr. Woods acknowledged on September 6, 2005, that he received the FTP Brochure, that he reviewed the FTP Brochure, and that he voluntarily agreed to use the [FTP] and to submit claims and/or disputes to final and binding arbitration." Woods's signed Acknowledgement was attached.

Korman's declaration also stated JFK "has treated, and continues to treat, patients from numerous different states. I am informed and believe, and on that basis state, that JFK Memorial's treatment of patients involves the use of medicine, equipment, and other supplies that are purchased from domestic and overseas manufacturers, suppliers, and distributors. Moreover, JFK Memorial recruits nurses nationwide, advertising positions on career recruitment websites."

5

Woods opposed. He argued the arbitration agreement was unconscionable under California law for multiple reasons. He also asserted JFK had failed to provide declarations or evidence to establish the FAA applied. With respect to the UCL and PAGA claims, he argued they were simply not arbitrable under California law, and Labor Code section 229 explicitly permitted actions for wages regardless of an arbitration agreement.

In support, Woods attached his own declaration stating that at the time he began his employment, he attended an orientation with hospital personnel and other new hires. He was provided with forms to fill out and sign, and was told they were mandatory. He "did not have the option not to sign the forms presented to me, and it was my understanding that if I chose not to sign the forms, I would not be hired." He was given the employee handbook and Acknowledgment, but was not provided with the time to read the handbook or the form he was told to sign. "The handbook . . . was very thick and was close to 100 pages."

Further, Woods stated he never received a copy of the FTP brochure. "I also was not advised by anyone affiliated with Tenet or JFK what the FTP was, what it meant, or what it otherwise required that I do. To this day, I do not recall ever being provided with a copy of an FTP brochure."

Woods also averred he was not provided a copy with the CBA at the beginning of his employment, nor was he given a chance to speak to his union representative to discuss his rights under the CBA. He was also not provided with the AAA arbitration rules. He stated he did not understand the FTP required him to waive his rights to pursue claims in court.

JFK filed a reply disputing Woods's arguments, and in due course the court issued a ruling granting JFK's motion. The court found Woods signed the Acknowledgment, and the agreement was voluntary because the CBA prohibited JFK

6

from taking adverse action against an employee who did not agree to it. Further, it was not unconscionable. The court found the agreement was covered by the FAA, and Labor Code section 229 was accordingly preempted. Nor were his statutory claims excluded from the agreement. Woods now appeals.

II

DISCUSSION

The parties disagree on numerous issues, but before we need address the applicability of the FAA or whether the PAGA claim must be arbitrated, we must determine whether a valid, enforceable arbitration agreement exists.

A. *Standard of Review and General Principles*

We use general principles of California contract law to determine the enforceability of an arbitration agreement. (*Mission Viejo Emergency Medical Associates v. Beta Healthcare Group* (2011) 197 Cal.App.4th 1146, 1153.) "'If the court's order is based on a decision of fact, then we adopt a substantial evidence standard. [Citations.] Alternatively, if the court's denial rests solely on a decision of law, then a de novo standard of review is employed. [Citations.]' [Citation.]" (*Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal.App.4th 50, 60.) When there is no conflicting evidence regarding the meaning of the agreement, its interpretation is a question of law. (*Ibid.*)

Code of Civil Procedure section 1281.2 requires a court to order arbitration "if it determines that an agreement to arbitrate . . . exists . . . ." (Code Civ. Proc., § 1281.2.) California has a strong public policy in favor of arbitration as an expeditious and cost-effective way of resolving disputes. (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9.) Even so, parties can only be compelled to arbitrate when they have agreed to do so. (*Westra v. Marcus & Millichap Real Estate Investment Brokerage Co., Inc.*

7

(2005) 129 Cal.App.4th 759, 763.) "Arbitration . . . is a matter of consent, not coercion . . . ." (*Volt Info. Sciences, Inc. v. Bd. of Trustees* (1989) 489 U.S. 468, 479.)

*B. Unconscionability*

The threshold question is whether any agreement to arbitrate existed. Woods does not contest this point, but argues instead the agreement was unconscionable. Civil Code section 1670.5, subdivision (a), codifies unconscionability as a reason for refusing a contract's enforcement. It states: "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." This provision applies to arbitration agreements.[1] (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 114 (*Armendariz*), abrogated in part on another ground in *AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. __, __ [131 S.Ct. 1740, 1746].)

"'[U]nconscionability has both a "procedural" and a "substantive" element,' the former focusing on '"oppression"' or '"surprise"' due to unequal bargaining power, the latter on '"overly harsh"' or '"one-sided"' results. [Citation.] 'The prevailing view is that [procedural and substantive unconscionability] must *both* be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability.' [Citation.] But they need not be present in the same degree. . . . [T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is

---

[1] Further, it applies to arbitration agreements under the FAA as well as under California law, so we need not decide whether the FAA applies at this juncture. (9 U.S.C. § 2; *Samaniego v. Empire Today, LLC* (2012) 205 Cal.App.4th 1138, 1150.)

8

unenforceable, and vice versa." (*Armendariz*, *supra*, 24 Cal.4th at p. 114.)  We discuss each of these in turn.

### 1. Procedural Unconscionability

"'"Procedural unconscionability" concerns the manner in which the contract was negotiated and the circumstances of the parties at that time.  [Citation.]  It focuses on factors of oppression and surprise.  [Citation.]  The oppression component arises from an inequality of bargaining power of the parties to the contract and an absence of real negotiation or a meaningful choice on the part of the weaker party.'  [Citation.]"  (*Morris v. Redwood Empire Bancorp* (2005) 128 Cal.App.4th 1305, 1319 (*Morris*).)

We therefore begin our analysis of procedural unconscionability by determining whether the agreement was a contract of adhesion.  (*See Parada v. Superior Court* (2009) 176 Cal.App.4th 1554, 1570.)  A contract of adhesion is "'"a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.'  [Citation.]"  (*Armendariz*, *supra*, 24 Cal.4th at p. 113.)  There was no conflicting evidence on this point.  JFK does not claim Woods had an opportunity to negotiate or change the terms of the FTP or the Acknowledgment, and there would be no evidence to support such an argument.  Woods's only choice was to sign or not to sign.  Any agreement to arbitrate was therefore a contract of adhesion.

That is not the end of our procedural unconscionability analysis, however.  (*Morris, supra,* 128 Cal.App.4th at p. 1319.)  We also consider whether surprise or oppression are present.  (*Gutierrez v. Autowest, Inc.* (2003) 114 Cal.App.4th 77, 87 (*Gutierrez*) ["The procedural element focuses on 'oppression' or 'surprise.'"].)  Oppression here might take the form of Woods being told he was required to sign the

9

Acknowledgment and thereby agree to arbitration, when in fact arbitration was supposed to be strictly voluntary, and free from retaliation if it was declined, under the CBA.

JFK argues that at best, the evidence here is conflicting. We disagree. The language of the Acknowledgment, FTP and CBAs are undisputed. It is undisputed that for a nurse covered by the CBAs, an arbitration agreement was supposed to be voluntary, not a condition of employment, and JFK could not retaliate for refusing to agree.

What is also undisputed is Woods's testimony regarding how the Acknowledgment was presented. He swore under oath he was told the forms he had to fill out and sign were "mandatory" and "it was my understanding that if I chose not to sign the forms, I would not be hired." It is undisputed he never received a copy of the CBA in effect at the time, nor was he told that he was not required to sign the Acknowledgment. JFK offers no evidence to contradict these facts.

JFK emphasizes the word "voluntarily" in the Acknowledgement, as if it were magic, but that word merely begs the question. If a prospective employee is told he is required to sign something to obtain employment, he might "voluntarily" sign the document, but there is nothing voluntary about his purported agreement. It becomes a coercive condition necessary to obtain employment, which was precisely what it was not supposed to be under the CBA. This constitutes oppression, and a particularly serious form of oppression at that.

It is further undisputed Woods did not receive a copy of the arbitration rules that would govern any proceeding before the AAA, nor do any of the documents provide information, such as a Web site, indicating where the rules may be readily obtained. The FTP confusingly states the arbitration shall be conducted under the "current *Employment* Dispute Resolution Rules of the AAA," but also states "discovery shall be conducted in accordance with the *Employee* Dispute Resolution Rules of the AAA." (Italics added.) It is unclear whether one of these references is a typographical

10

error, but JFK makes no claim and offers no evidence that any set of arbitration rules was provided to Woods, and the Acknowledgement does not state that Woods received it. JFK did seek judicial notice of a *2009* document entitled "AAA Employment Arbitration Rules and Mediation Procedures," which only confuses matters further, and begs the question as to the meaning of "current" in the FTP — it is unclear whether "current" refers to the rules in existence in 2004, or in effect at the time Woods might wish to arbitrate. This 2009 document obviously did not even exist in 2004. In any event, it is undisputed Woods received no arbitration rules at all. Both the failure to provide the arbitration rules and the apparent lack of the existence of any rules under the name to which the FTP refers each add to the procedural unconscionability. (*Zullo v. Superior Court* (2011) 197 Cal.App.4th 477, 485-486, fn.3.)

JFK argues that incorporating the rules by reference is sufficient, and any requirement to actually provide the rules violates the precept that arbitration contracts cannot create burdens not carried by other contracts. "'For the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties.'" (*Williams Constr. Co. v. Standard-Pacific Corp.* (1967) 254 Cal.App.2d 442, 454.) Given the two different titles of the arbitration rules set forth in the FTP, the rules with a third title it later sought judicial notice of, and the lack of any information about where Woods could obtain the rules, we conclude JFK did not properly incorporate any arbitration rules by reference.

Further, when taken as a whole, we find the entire arbitration scheme unduly confusing, and therefore oppressive, to a layperson. Rather than designing a single, reasonably short document containing the entire arbitration agreement and nothing else, and executed like a contract, JFK has chosen to make its procedure needlessly

11

complex. The actual agreement to arbitrate is buried in the fourth paragraph of a document entitled "Employee Acknowledgment Form." The details of this are then toward the end of another document, the FTP. The FTP itself is a complex morass of complaints and appeals the employee is required to undertake before even being allowed to arbitrate (we will address the substantive aspect of this below). Nowhere in the Acknowledgment or the FTP does JFK disclose to CBA-covered employees that participation in this entire "procedure" is optional, and that refusal will not result in any retaliation.

Given this needless complexity, the result is oppression in the form of uncertainty, confusion, and failure to notify the employee of their rights. As Woods testified, this is precisely how he reacted: "I also was not advised by anyone affiliated with Tenet or JFK what the FTP was, what it meant, or what it otherwise required that I do." Given both the oppressiveness of the agreement and its adhesive nature, a high level of procedural unconscionability is present.

### 2. Substantive Unconscionability

While procedural unconscionability focuses on how the agreement was obtained and executed, "[s]ubstantive unconscionability focuses on whether the provision is overly harsh or one-sided and is shown if the disputed provision of the contract falls outside the 'reasonable expectations' of the nondrafting party or is 'unduly oppressive.' [Citations.]" (*Gutierrez*, *supra*, 114 Cal.App.4th at p. 88.) "Substantively unconscionable terms may take various forms, but may generally be described as unfairly one-sided." (*Little v. Auto Stiegler, Inc.* (2003) 29 Cal.4th 1064, 1071.) "Where a party with superior bargaining power has imposed contractual terms on another, courts must carefully assess claims that one or more of these provisions are one-sided and unreasonable." (*Gutierrez*, *supra*, 114 Cal.App.4th at p. 88.) "[T]he paramount

12

consideration in assessing [substantive] conscionability is mutuality." (*Abramson v. Juniper Networks, Inc.* (2004) 115 Cal.App.4th 638, 657 (*Abramson*).)

The FTP contains the following provision: "*Modifications to the FTP:* The company will not modify or change the agreement between you and the company to use final and binding arbitration to resolve employment-related disputes without notifying you and obtaining your consent to such changes. However, the company may change or modify the FTP procedures from time-to-time without advance notice and without the consent of employees." The FTP does not include the actual agreement to arbitrate, however — this is included in the Acknowledgment: "I hereby voluntarily agree to use the Company's Fair Treatment Process and to submit to final and binding arbitration any and all claims and disputes that are related in any way to my employment or the termination of my employment with Tenet." The Acknowledgment also states: "I also understand that the company may change, rescind or add to any of the policies, benefits or practices described in the Employee Handbook, except . . . the Mutual Agreement to Arbitrate referred to below, in its sole and absolute discretion, with or without prior notice."

This provision is troubling in a number of respects. JFK claims these provisions prohibit any modification to actual arbitration procedures, as well as the actual agreement to arbitrate. Taken together, these provisions are at best confusing and potentially conflicting. The FTP's language stating JFK "will not modify or change *the agreement* between you and the company to use final and binding arbitration" (italics added) is not wholly consistent with the Acknowledgment's language that JFK can "change, rescind or add to" anything except the agreement to arbitrate. The FTP's language implies only that JFK cannot change the agreement to use arbitration, while the Acknowledgment may imply something more. At a minimum, it is confusing, and appears to leave the door open for JFK to make changes without employee agreement.

13

Even if we adopt JFK's position on that it cannot unilaterally modify anything to do with actual arbitration procedures, JFK has unquestionably reserved the right to change the pre-arbitration procedures in the FTP. Already burdensome to the employee at four steps, there is nothing to stop JFK from unilaterally expanding these procedures to add yet more burdens to employees before they are even permitted to begin arbitration. Given these procedures are mandatory in most cases, we see little difference between changing the arbitration and pre-arbitration procedures in this particular case. JFK, by giving itself the permission to make such changes unilaterally, and without any notice, has created an unfairly one-sided agreement. (*Little v. Auto Stiegler, Inc.*, *supra*, 29 Cal.4th at p. 1071; *Abramson*, *supra*, 115 Cal.App.4th at p. 657.)

Woods also argues the FTP lacks mutuality because the pre-arbitration proceedings must only be undertaken by employees and not JFK. The language of the FTP supports this claim: "The FTP consists of the following five steps that *employees* generally must follow to obtain a resolution of a problem, concern, or dispute . . . ." (Italics added.) The steps include multiple references to "you," meaning the employee. There is no indication JFK must also use the FTP procedure to resolve a problem with an employee. The forms provided to employees to use in accordance with the FTP include language such as "STEP 1 – Grievance (to be submitted to Immediate Supervisor): [¶] 1. Please describe below with as much detail as possible the dispute or problem that you would like your supervisor to help you resolve . . . ." Nothing in any of the language indicates mutuality.

Again, this indicates a one-sided process that also gives JFK the benefit of a pre-arbitration preview of Woods's case. "[R]equiring plaintiff to submit to an employer-controlled dispute resolution mechanism (i.e., one without a neutral mediator) suggests that defendant would receive a 'free peek' at plaintiff's case, thereby obtaining an advantage if and when plaintiff were to later demand arbitration." (*Nyulassy v.*

14

*Lockheed Martin Corp.* (2004) 120 Cal.App.4th 1267, 1283.) This is another unfairly one-sided provision indicating substantive unconscionability. "[T]he paramount consideration in assessing [substantive] conscionability is mutuality." (*Abramson, supra,* (2004) 115 Cal.App.4th at p. 657), and this agreement has failed that test in several important respects. Taken together with the substantial level of procedural unconscionability, the agreement is sufficiently substantively unconscionable to preclude its enforcement.

We are, frankly, perplexed that we continue to see arbitration agreements such as this one. The years since *Armendariz* have produced a veritable flood of cases about arbitration between employers and employees. Employers should be well aware by now that to insulate their agreements from unconscionability claims, particularly when they are adhesive contracts, there is a simple list of do's and don'ts. The arbitration agreement should be conspicuous (and preferably labeled as such, in a document separate from a lengthy handbook). The document should be written in plain English, attach or make readily available all referenced documents, be fundamentally fair and mutual, and in all respects abide by the guidance provided in *Armendariz*. Further, employers should give the employee a *meaningful* opportunity to review the agreement and decide whether to sign it (meaning a day or two rather than a minute or two). We do not understand why any of this is particularly difficult or challenging for employers, and yet time and time again, our courts see cases with confusing, convoluted and fundamentally unfair employer/employee arbitration schemes that are deemed unconscionable and unenforceable. (See, e.g., *Carmona v. Lincoln Millennium Car Wash, Inc.* (2014) 226 Cal.App.4th 74; *Samaniego v. Empire Today, LLC*, *supra*, 205 Cal.App.4th 1138 [contract workers]; *Zullo v. Superior Court*, *supra*, 197 Cal.App.4th 477; *Trivedi v. Curexo Technology Corp.* (2010) 189 Cal.App.4th 387; *Nyulassy v. Lockheed Martin*

*Corp*, *supra*, 120 Cal.App.4th 1267; *Fitz v. NCR Corp.* (2004) 118 Cal.App.4th 702; *Abramson*, *supra*, 115 Cal.App.4th 638; *Gutierrez*, *supra*, 114 Cal.App.4th 77.)

This is one such agreement.  Taken as a whole, we find the agreement both procedurally and substantively unconscionable and therefore unenforceable.  The parties' remaining arguments are moot, and JFK's request for judicial notice is denied as irrelevant.

### III

### DISPOSITION

The court's order is reversed and the case remanded for further proceedings.  Woods is entitled to his costs on appeal.

MOORE, J.

WE CONCUR:

RYLAARSDAM, ACTING P. J.

THOMPSON, J.

16