Filed 2/28/24  Valadez v. In-N-Out Burgers CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ERIKA VALADEZ et al., | B318125 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC675696) |
| v. | |
| IN-N-OUT BURGERS, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Malcolm Mackey, Judge.  Affirmed.

Mallison & Martinez, Stan S. Mallison, Hector R. Martinez, and Gonzalo Quezada for Plaintiffs and Appellants.

Littler Mendelson, Fermin H. Llaguno, and Michael L. Kibbe for Defendant and Respondent.

————————————

Plaintiffs Erika Valadez and Efren Lara appeal from the trial court's judgment affirming an arbitration award in favor of defendant In-N-Out Burgers (INO). Plaintiffs contend the court erred in concluding their employment-related claims were subject to arbitration. Valadez argues that INO failed to prove she signed the arbitration agreement, and both plaintiffs assert that even if they signed it, they timely opted out of the agreement. Plaintiffs also argue the arbitration agreement was unconscionable. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Lara and Valadez began working for INO in 1987 and 2008, respectively. Lara was Valadez's direct supervisor at INO's meat processing facility. In September 2017, Valadez, Lara, and five others[1] filed a complaint against INO, alleging sexual and national origin discrimination, sexual harassment, hostile work environment, and other employment-related claims.

## I.     Motion to Compel Arbitration

In February 2018, INO filed a motion to compel arbitration of plaintiffs' claims. In support of the motion, INO's Regional Human Resources Manager, Deborah Marianno, attested that in 2013, plaintiffs received and electronically signed INO's dispute resolution agreement (DRA) through an online training module. The training module provided the associate a copy of the four-page DRA in both English and Spanish. The DRA stated the agreement was governed by the Federal Arbitration Act. It explained:

---

[1]     We do not discuss the five other plaintiffs any further. We use "plaintiffs" to refer solely to Valadez and Lara.

Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law, and therefore this Agreement requires all such disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial. Such disputes include without limitation disputes arising out of or relating to interpretation or application of this Agreement, but not as to the enforceability, revocability or validity of the Agreement or any portion of the Agreement.

The Agreement also applies, without limitation, to disputes regarding the employment relationship, trade secrets, unfair competition, compensation, breaks and rest periods, termination, or harassment and claims arising under the Uniform Trade Secrets Act, Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act, Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, and all other state statutory and common law claims (excluding worker[']s compensation state disability insurance and unemployment insurance claims).

The DRA further stated the arbitrator "shall be selected by mutual agreement of [INO and the employee]" and that "the parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence as needed to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator." As to paying for arbitration, the DRA stated: "Each party will pay the fees for his,

3

her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. However, in all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and for arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes in that regard will be resolved by the Arbitrator."

Although the DRA waived the employee's right to "bring any dispute in arbitration on . . . a class, collective, or private attorney general basis," it provided that the waiver "shall be severable in any case in which the dispute is filed as an individual action and severance is necessary to ensure that the individual action proceeds in arbitration."

Paragraph 10 of the DRA, titled "An Associate's Right to Opt Out of this Agreement" stated:

> An Associate may submit a form stating that the Associate wishes to opt out and not be subject to this Agreement. The Associate must submit a signed and dated statement on a "Dispute Resolution Agreement Opt Out Form" ("Form") that can be obtained from the Company's website, www.in-n-out.com, under the Associate Events/Associate Portal tab at the bottom of the home page. In order to be effective, the signed and dated Form must be returned to the Human Resources Department within 30 days of the Associate's receipt of this Agreement. For Associates under 18 years old choosing to opt out, the signed and dated Form must be returned to the Human Resources Department within 30 days of the receipt of the Agreement by the Associate's parent or guardian. An Associate who timely opts out as provided in this paragraph will not be subject to any

4

adverse employment action as a consequence of that decision and may pursue available legal remedies without regard to this Agreement. Should an Associate not opt out of this Agreement within 30 days of the Associate's (or minor Associate's parent or guardian's) receipt of this Agreement, continuing the Associate's employment constitutes mutual acceptance of the terms of this Agreement by Associate and the Company. An Associate has the right to consult with counsel of the Associate's choice concerning this Agreement.

To access the DRA training module which presented the agreement quoted in part above, associates were required to input their unique associate number and their personal identification number (PIN), which they were prohibited from sharing with others. Marianno stated: "Toward the conclusion of the module [informing the associate of her rights and obligations under the DRA], a dialog box asks the Associate to acknowledge her receipt of the DRA as well as her understanding that, among other things, she may voluntarily opt out of the DRA and, if she does not timely do so, 'it constitutes mutual acceptance' of the DRA. The Associate acknowledges this by clicking a button stating, 'I acknowledge,' at the bottom of the dialog box. After the completion of the module, after the Associate's acknowledgment of the DRA, the signature and date line of the DRA become populated with the Associate's printed name and the date and time of the Associate's assent, respectively. A record of this activity gets saved in INO's electronic databases in the ordinary course of business." In addition, the training module explained "the process an Associate should undertake should they have wished to opt out from the DRA. Further, the module explained

that any associate questions or concerns could be addressed to either the Legal or Human Resources Departments and provides a phone number to contact." Marianno stated that since the implementation of the DRA in 2012, more than 260 associates have opted out.

Marianno attested INO's records showed that in February 2013, Valadez and Lara completed the DRA training module, and received and acknowledged the DRA. Marianno attached as exhibits to her declaration records of Valadez's and Lara's electronically-signed and time-stamped agreements, which state above their signatures: "I acknowledge receipt of and agree to this Dispute Resolution Agreement." Marianno reported that INO did not receive opt out forms from Valadez or Lara.

## II.    Opposition to the Motion to Compel Arbitration

In March 2018, Valadez and Lara filed their opposition to INO's motion to compel arbitration, attacking the DRA's formation and fairness. They first argued their " 'electronic acknowledgments' [on the DRAs were] not valid signatures and [did] not create a contract." Valadez denied ever seeing the DRA module and insinuated another employee electronically forged it with her employee identification number. Lara asserted he signed it under threat of termination.

In her declaration, Valadez attested her primary language is Spanish but she can read and speak English on a basic level. Valadez averred that while working for INO, she never used a computer and did not know how to use a computer. Valadez stated that on two occasions she was assisted by bilingual INO coworker Ana Rodriguez in completing surveys on the computer. However, Valadez attested these two occasions did not involve the DRA. She stated the first time she saw the DRA was when

6

INO produced it to her attorneys in response to a request for her personnel file. She said that she never participated in any online modules and never clicked on any acknowledge button to sign the DRA. She attested that not only Rodriguez, but other supervisors, managers, and assistants knew how to log into her employee account using her associate number. Valadez denied having a PIN. In 2017, Valadez completed the opt out form and submitted it to INO's human resources department.

Lara (Valadez's supervisor) also attested: "Valadez did not personally use a computer at the times indicated [by Marianno]. Instead, another employee logged in under [Valadez's account] and input information for [her]. This was a common practice for employees who did not speak English or know how to use computers." Counsel argued someone else from INO signed Valadez's name to the DRA without her consent.

In his declaration, Lara admitted to electronically signing the DRA in February 2014 but only because his supervisor told him he would need to "get a lawyer" if he did not sign it. Lara attested he felt that he would be fired if he did not sign immediately and he did not read the DRA when he signed it. Lara subsequently submitted the DRA opt out form in 2017 with assistance from his lawyers.

Plaintiffs also asserted the DRA was unenforceable because it was unconscionable. They argued that the DRA was procedurally unconscionable since it was "clearly [a contract] of adhesion," failed to state the method for selecting an arbitrator, and provided no rules for arbitration. Plaintiffs contended the DRA was substantively unconscionable since it lacked mutuality with regard to a confidentiality agreement. If plaintiffs violated

7

their confidentiality agreement with INO, INO could apply to a court for injunctive relief.

## III. INO's Reply

In May 2018, INO filed its reply, attacking plaintiffs' credibility. INO pointed out that Valadez (who had attested she never had a PIN and thus could not electronically sign the DRA) needed a PIN to clock in and out of work, complete and receive evaluations, and do other necessary work functions. Valadez's performance evaluations from 2011 through 2013 showed her electronic signatures with date stamps, all made by using her unique PIN. INO also produced a copy of INO's "Personal Identification Number (PIN) Policy," which Valadez signed by hand. In the signed policy, Valadez acknowledged that she must (1) "take all steps necessary to protect the confidentiality of [her] PIN"; (2) "not under any circumstances share [her] PIN with anyone"; (3) "establish a new PIN in a confidential manner" if she forgets it or if someone learns her PIN; and (4) "not use another person's PIN under any circumstances." Several other INO employees from the meat packing facility also attested that associates' PINs were confidential and were not shared with others.

In support of the reply, Rodriguez declared that when she was an associate in the meat department, at the request of her supervisors, she occasionally helped associates, whose primary language was Spanish, complete INO's web-based performance evaluations. Her assistance was limited to translating words or sentences associates did not understand. Rodriguez stated she did not know Valadez's or any other employee's PIN. Rodriguez had observed Valadez log herself into the computer during training modules and Valadez had no trouble using the computer.

8

Rodriguez only minimally assisted Valadez with translation. According to INO's attendance records, Rodriguez was not at work on the date Valadez electronically signed the DRA.

INO also asserted Lara's failure to read the DRA and to opt out as permitted in the DRA were a result of Lara's own lack of diligence and not any procedural unconscionability on the part of INO. Lara's supervisor contradicted Lara's statements and attested that he did not compel Lara to sign anything, he was never pressured by his superiors to obtain anybody's agreement to the DRA, and he always understood that associates could opt out of the DRA at their choosing without any negative repercussions. INO additionally pointed out that a section of the DRA contained the rules for arbitration.

## IV. The Court's Ruling and Subsequent Entry of Judgment

In June 2018, after hearing argument, the court found "plaintiffs expressly [agreed] to resolve any dispute they have with the defendant [INO] arising from their employment through binding arbitration. The agreements were entered electronically after each employee accessed the document online." The court granted INO's motion to compel arbitration, stayed the matter, and ordered the parties into binding arbitration.

Three years later, after successfully defending against plaintiffs' claims, INO filed its petition to confirm the contractual arbitration award. In January 2022, the trial court entered judgment in favor of INO, stating plaintiffs take nothing by their complaint. Plaintiffs timely appealed.

## DISCUSSION

Plaintiffs assert: (1) INO failed to prove Valadez assented to the arbitration agreements, (2) both plaintiffs opted out of the

9

agreement, and (3) the DRA was procedurally and substantively unconscionable.

## I. General Principles

"Although the arbitration agreement in the present case provides that the arbitration is to be governed by the [Federal Arbitration Act (FAA)] and not California law, generally the California Arbitration Act [(CAA, Code Civ. Proc.,[2] §§ 1280–1294.2)] governs arbitral procedures brought in California courts." (*Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899, 922.) Under the CAA, "when a petition to compel arbitration is filed and accompanied by prima facie evidence of a written agreement to arbitrate the controversy, the court itself must determine whether the agreement exists and, if any defense to its enforcement is raised, whether it is enforceable. Because the existence of the agreement is a statutory prerequisite to granting the petition, the petitioner bears the burden of proving its existence by a preponderance of the evidence. If the party opposing the petition raises a defense to enforcement . . . that party bears the burden of producing evidence of, and proving by a preponderance of the evidence, any fact necessary to the defense." (*Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 413 (*Rosenthal*); §§ 1281.2, 1290.2.) "In these summary proceedings, the trial court sits as a trier of fact, weighing all the affidavits, declarations, and other documentary evidence, as well as oral testimony received at the court's discretion, to reach a final determination. [Citation.]" (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972.)

---

[2]     All subsequent statutory references are to the Code of Civil Procedure.

10

Where, as in this case, the order granting a motion to compel arbitration depends on resolution of disputed facts, we review the decision for substantial evidence. (*Ahern v. Asset Management Consultants, Inc.* (2022) 74 Cal.App.5th 675, 687 (*Ahern*).) In doing so, we must " ' " 'accept the trial court's resolution of disputed facts when supported by substantial evidence; we must presume the court found every fact and drew every permissible inference necessary to support its judgment, and defer to its determination of the credibility of witnesses and the weight of the evidence.' " ' " (*Hotels Nevada, LLC v. L.A. Pacific Center, Inc.* (2012) 203 Cal.App.4th 336, 348.)

## II. Substantial Evidence Supported the Court's Finding that Valadez Agreed to the DRA[3]

Valadez argues INO failed to prove that she agreed to the DRA. "Every contract requires mutual assent or consent (Civ. Code, §§ 1550, 1565), and ordinarily one who signs an instrument which on its face is a contract is deemed to assent to all its terms. A party cannot avoid the terms of a contract on the ground that he or she failed to read it before signing." (*Marin Storage & Trucking, Inc. v. Benco Contracting & Engineering, Inc.* (2001) 89 Cal.App.4th 1042, 1049 (*Marin Storage*).)

Under Civil Code section 1633.7, "an electronic signature has the same legal effect as a handwritten signature." (*Ruiz v. Moss Bros. Auto Group, Inc.* (2014) 232 Cal.App.4th 836, 843 (*Ruiz*).) "Civil Code section 1633.9 addresses how a proponent of an electronic signature may authenticate the signature—that is, show the signature is, in fact, the signature of the person the

---

[3] Lara did not deny signing the DRA; on appeal, he argues that it is unenforceable for other reasons discussed below.

11

proponent claims it is.  The statute states:  '(a) An electronic record or electronic signature is attributable to a person if it was the act of the person.  *The act of the person may be shown in any manner*, including a showing of the efficacy of any security procedure applied to determine the person to which the electronic record or electronic signature was attributable.' (Civ. Code, § 1633.9, subd. (a), italics added.)" (*Ruiz, supra*, 232 Cal.App.4th at p. 843.)

Valadez cites her own declaration and argues "the record clearly reflects that someone other than Valadez accessed the online training module and affixed her signature without her authorization, knowledge, or consent."  She contends that INO summarily asserted that Valadez signed the DRA and that Regional Human Resources Manager Marriano's declaration was insufficient to authenticate Valadez's signature.  We disagree.

Marianno attested INO's records showed that on February 27, 2013, Valadez completed the DRA training module and electronically signed the DRA by entering her employee identification number and her PIN.  Upon entry of these numbers, Valadez's printed name and the date and time of her assent populated the signature and date line of the DRA; a record of the agreement was saved to INO's electronic database.  Entry of the employee identification number and PIN was the only way to create this electronic record.  Declarations from Marianno and other employees, and the copy of INO's PIN Policy, hand-signed by Valadez, supported the court's implicit conclusion that despite Valadez's assertion otherwise, Valadez had a PIN, which she was prohibited from sharing with others, and that she regularly used for routine work functions.  The court could reasonably conclude that the electronic signature on the DRA was attributable to

12

Valadez since INO's evidence indicated the PIN was known solely to her.

The court was not required to believe Valadez's statements to the contrary. And, "[i]t is not the function of this court to reweigh the evidence and substitute its judgment for the judgment of the trial court." (*Berman v. Health Net* (2000) 80 Cal.App.4th 1359, 1373 [affirming trial court's denial of a motion to compel arbitration].) Valadez's assertion that the authentication was invalid because INO's security measures lacked integrity fails for the same reason. The court was entitled to disbelieve Valadez's statements about how others logged her into computers, particularly in light of INO's employee declarations that they did not do so.

Valadez likens the facts here to *Ruiz, supra,* 232 Cal.App.4th at pages 842–844, asserting INO's evidence was insufficient to prove her consent. In *Ruiz*, the Court of Appeal concluded the evidence was insufficient to support a finding that an electronic signature on the arbitration agreement was the act of Ruiz because the business manager authenticating the arbitration agreement "summarily asserted . . . that Ruiz was the person who electronically signed the [arbitration] agreement." (*Ruiz*, at p. 843.) The fatal flaw of the business manager's declaration was that she "did not explain that an electronic signature . . . could only have been placed on the [arbitration] agreement . . . by a person using Ruiz's 'unique login ID and password'; that the date and time printed next to the electronic signature indicated the date and time the electronic signature was made; that all . . . employees were required to use their unique login ID and password when they . . . signed electronic forms and agreements; and the electronic signature . . . was,

therefore, apparently made by Ruiz on September 21, 2011, at 11:47 a.m." (*Ibid.*)

In contrast, Marianno's declarations provided these critical facts. INO's evidence more closely tracks the declaration proffered by the employer in *Espejo v. Southern California Permanente Medical Group* (2016) 246 Cal.App.4th 1047 (*Espejo*). Distinguishing its facts from the facts in *Ruiz*, the *Espejo* court found sufficient evidence that the employee signed the arbitration agreement where the employer's declarant detailed the "security precautions regarding transmission and use of an applicant's unique username and password, as well as the steps an applicant would have to take to place his or her name on the signature line of the employment agreement and the [agreement]" by using that unique username and password. (*Id.* at 1062.) Like in *Espejo*, the details provided by Marianno satisfy the requirements articulated in *Ruiz* and establish that the electronic signature on the document was an act of Valadez.

Without citation to authority, Valadez asserts that INO failed to prove she signed the DRA because INO did not offer a "percipient witness who . . . personally witnessed Valadez click the button acknowledging her consent to affix her electronic signature [or] who could attest that they at least heard Valadez verbally agree to allow another employee to affix her electronic signature to the document." However, INO needed only to demonstrate that the electronic signature was Valadez's act, which could be shown "in any manner," including by demonstrating that the DRA could only be signed by Valadez using her unique employee identification number and private

14

PIN. (Civ. Code, § 1633.9, subd. (a); *Ruiz, supra,* 232 Cal.App.4th at p. 843.)[4]

## III.  Plaintiffs Did Not Timely Opt Out of the DRA

Plaintiffs argue that even if they signed the DRA, they timely opted out within 30 days of receiving a physical copy of the DRA after their attorneys requested their employment records. Although plaintiffs made factual assertions in their declarations about opting out, in their opposition brief before the trial court, they did not argue that the DRA was inapplicable to their claims due to their belated opt outs.  (See *Blankenship v. Allstate Ins. Co.* (2010) 186 Cal.App.4th 87, 105 ["We do not consider factual arguments raised for the first time on appeal, and this argument is forfeited."].)  Although we generally do not consider such a factual argument for the first time on appeal, we nonetheless exercise our discretion to address this purely legal question because of the undisputed factual record.  (*DD Hair Lounge, LLC v. State Farm General Ins. Co.* (2018) 20 Cal.App.5th 1238, 1243.)

According to paragraph 10 of the DRA, "In order [for the opt out] to be effective, the signed and dated Form must be returned to the Human Resources Department within 30 days of the Associate's receipt of this Agreement."  Plaintiffs assert "receipt" means when they obtained a copy of the agreement in 2017.

---

[4]     In their reply brief, plaintiffs argue the court abused its discretion in declining to hold an evidentiary hearing on the issue of consent.  We disagree.  "There is simply no authority for the proposition that a trial court necessarily abuses its discretion, in a motion proceeding, by resolving evidentiary conflicts without hearing live testimony."  (*Rosenthal, supra,* 14 Cal.4th at p. 414.)  The court had adequate evidence before it to make its decision.

In making this argument, plaintiffs ignore the plain language of the agreement. "We interpret words in a contract in accordance with their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage. [Citation.] If contractual language is clear and explicit and does not involve an absurdity, the plain meaning governs." (*Westrec Marina Management, Inc. v. Arrowood Indemnity Co.* (2008) 163 Cal.App.4th 1387, 1392.)

The final page of the DRA, above plaintiffs' time-stamped signatures, states, "I acknowledge receipt of and agree to this Dispute Resolution Agreement." Thus, Valadez and Lara received the DRA on February 27 and 28, 2013, respectively, as reflected on the signature lines of their electronically-signed DRAs. Since plaintiffs submitted their opt out forms years after receiving the DRA, they failed to timely opt out within 30 days of receipt.

## IV. Despite Some Procedural Unconscionability, the Agreement Was Enforceable

Plaintiffs also argue the DRA was unenforceable because it is unconscionable. " '[G]enerally applicable contract defenses, such as . . . unconscionability, may be applied to invalidate arbitration agreements without contravening' the FAA. [Citations.] Unconscionability consists of both procedural and substantive elements. The procedural element addresses the circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power. [Citations.] Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided. [Citations.] A contract term is not substantively unconscionable when it merely

16

gives one side a greater benefit; rather, the term must be 'so one-sided as to "shock the conscience." ' " (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 246 (*Pinnacle*).)

"The party resisting arbitration bears the burden of proving unconscionability.  [Citations.]  Both procedural unconscionability and substantive unconscionability must be shown, but 'they need not be present in the same degree' and are evaluated on ' "a sliding scale." '  [Citation.]  '[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.' " (*Pinnacle, supra,* 55 Cal.4th at p. 247.)

"[U]nconscionability is a question of law we review de novo. [Citation.]  To the extent the trial court's determination on the issue turned on the resolution of contested facts, we would review the court's factual determinations for substantial evidence." (*Carmona v. Lincoln Millennium Car Wash, Inc.* (2014) 226 Cal.App.4th 74, 82.)

### a.      *Procedural Unconscionability*

Procedural unconscionability requires oppression or surprise.  (*Pinnacle, supra,* 55 Cal.4th at p. 247.)  " 'Oppression occurs where a contract involves lack of negotiation and meaningful choice, surprise where the allegedly unconscionable provision is hidden within a prolix printed form.' " (*Morris v. Redwood Empire Bancorp* (2005) 128 Cal.App.4th 1305, 1317.) "A procedural unconscionability analysis 'begins with an inquiry into whether the contract is one of adhesion.'  [Citation.]  An adhesive contract is standardized, generally on a preprinted form, and offered by the party with superior bargaining power 'on

17

a take-it-or-leave-it basis.' " (*OTO, L.L.C. v. Kho* (2019) 8 Cal.5th 111, 126; see *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 113 (*Armendariz*).) Under California law, "an opt-out provision does not insulate an arbitration agreement from a finding of procedural unconscionability." (*Swain v. LaserAway Medical Group, Inc.* (2020) 57 Cal.App.5th 59, 69.)

In *Gentry v. Superior Court* (2007) 42 Cal.4th 443, 470 (*Gentry*), abrogated on other grounds by *Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 360 (*Iskanian*), our Supreme Court held that a 30-day opt out provision, like the one at issue in this case, did not automatically eliminate procedural unconscionability and must be considered in light of the rest of the circumstances of the contract. The court explained, "It is true that freedom to choose whether or not to enter a contract of adhesion is a factor weighing against a finding of procedural unconscionability." (*Gentry,* at p. 470.)

Despite the opt out provision, the Supreme Court concluded there was no authentic informed choice made by Gentry based on the one-sided information provided by his employer, Circuit City. (*Gentry, supra*, 42 Cal.4th at pp. 470–472.) At the time of hiring, Circuit City gave Gentry "a packet that included an 'Associate Issue Resolution Package' and Circuit City's 'Dispute Resolution Rules and Procedures.' " (*Id.* at p. 451.) Although the package "alluded to some of the shortcomings of arbitration in the general sense, it did not mention any of the additional significant disadvantages that *this particular arbitration agreement* had compared to litigation." (*Id.* at p. 470.) The Circuit City arbitration agreement significantly curtailed the employee's legal remedies and rights by reducing the statute of limitations for

overtime wages and the recovery period for backpay, imposing a maximum of $5,000 in punitive damages, and eliminating the employee's ability to recover attorney fees if successful in arbitration. (*Id.* at pp. 470–471.) The court explained that although an employee who read the dispute resolution rules and procedures "would have encountered the above provisions, only a legally sophisticated party would have understood that these rules and procedures are considerably less favorable to an employee than those operating in a judicial forum." (*Id.* at p. 471.)

The Supreme Court further stated, "it is not clear that someone in Gentry's position would have felt free to opt out. The materials provided to Gentry made unmistakably clear that Circuit City preferred that the employee participate in the arbitration program. The 'Associate Issue Resolution Handbook' distributed with the opt[]out form touted the virtues of arbitration, including use of the all-capitalized subheading— WHY ARBITRATION IS RIGHT FOR YOU AND CIRCUIT CITY—that left no doubt about Circuit City's preference. The fact that the arbitration agreement was structured so that arbitration was the default dispute resolution procedure from which the employee had to opt out underscored Circuit City's proarbitration stance. Given the inequality between employer and employee and the economic power that the former wields over the latter [citation], it is likely that Circuit City employees felt at least some pressure not to opt out of the arbitration agreement. The lack of material information about the disadvantageous terms of the arbitration agreement, combined with the likelihood that employees felt at least some pressure not to opt out of the arbitration agreement, leads to the conclusion

19

that the present agreement was, at the very least, not entirely free from procedural unconscionability." (*Gentry, supra,* 42 Cal.4th at pp. 471–472.)

As there was some procedural unconscionability, the Supreme Court remanded for the Court of Appeal to analyze the existence of substantive unconscionability, which it had not addressed on appeal. (*Gentry, supra,* 42 Cal.4th at p. 472.) The Court stated: "To reiterate, the fact that some degree of procedural unconscionability is present does not mean necessarily that the arbitration agreement is unenforceable. But it does mean that the agreement is not immune from judicial scrutiny to determine whether or not its terms are so one-sided or oppressive as to be substantively unconscionable." (*Id.* at p. 472.)

Similarly here, the DRA suffers from some of the flaws exhibited by the *Gentry* agreement. First and foremost, INO required plaintiffs to sign and acknowledge the DRA; plaintiffs had no choice but to do this to complete the training module. To opt out, INO employees had to go through two extra steps: seeking out an opt out form online and submitting it to INO's human resources department within 30 days. As in *Gentry*, arbitration was the default option for the employees and opting out was additional work.

The training module also made clear that arbitration was INO's preferred method for resolving conflicts with employees. As plaintiffs point out, the module states that arbitration furthers employees' " '[r]ight to be heard and to have their concerns addressed,' and 'respects and protects the rights of the Associate.' " We agree these aspects of the DRA and training module introducing the DRA were somewhat oppressive. Like in *Gentry*, it is not clear that non-executive employees in INO's

meat packing plant would have felt free to opt out given the pressure from INO's pro-arbitration messaging in the training module and INO's implicit discouragement of the opt out provision.

However, unlike *Gentry*, the DRA did not curtail the employee's rights to recover individual damages, which was perhaps the most egregious aspect of the *Gentry* agreement. Instead, the DRA, which was provided in both English and Spanish, informed employees that they were giving up their right to bring a lawsuit against INO in court and that the agreement was not mandatory. In sections 4 through 6, the DRA provided the applicable arbitration rules, e.g. rules for commencing arbitration, selecting the arbitrator, discovery, presentation of evidence, and effect of the arbitrator's decision. INO's training module also "explained that any associate questions or concerns could be addressed to either the Legal or Human Resources Departments and provide[d] a phone number to contact."[5] The existence of a clear opt out provision and INO's disclosure of the arbitration rules and procedures show that the contract was not really offered on a " 'take it or leave it basis,' " as plaintiffs assert. As such, the procedural unconscionability is not great.

---

[5] Lara asserts that the DRA was procedurally unconscionable because he "was not provided with a copy of the agreement nor never given any of the rules that would govern if he voluntarily agreed to arbitration." As stated above, the rules were provided. Had Lara wanted a copy of the agreement after he signed it, he could have requested it from either the human resources or legal departments; he does not state that he asked for such a copy.

As to Lara in particular, he asserts his agreement was infected with oppression because his supervisor stated if he did not sign the agreement, he would have to "get a lawyer." Lara interpreted this to mean he would be terminated if he did not sign the DRA. Had Lara read through the training module and DRA, he would have learned he could opt out of the agreement. (See *Marin Storage, supra,* 89 Cal.App.4th at p. 1049 ["A party cannot avoid the terms of a contract on the ground that he or she failed to read it before signing."].) The plain language of the agreement made it clear that Lara's inference about termination was incorrect and the agreement was not oppressive on this basis. (Cf. *OTO L.L.C. v. Kho*, *supra*, 8 Cal.5th at p. 127 [arbitration agreement unconscionable where the agreement's contents and significance were unexplained by employer, and employee was required to sign the agreement to keep the job he had held for three years].)

Based on the foregoing, we conclude the DRA was infected with some procedural unconscionability.

### b. *Substantive Unconscionability*

The court's inquiry into whether a contract is substantively unconscionable "focus[es] on . . . ' "overly harsh" ' or ' "one-sided" ' results." (*Armendariz, supra,* 24 Cal.4th at p. 114.) "[T]he paramount consideration in assessing [substantive] conscionability is mutuality." (*Abramson v. Juniper Networks, Inc.* (2004) 115 Cal.App.4th 638, 657.)

Plaintiffs argue the DRA is substantively unconscionable because it primarily requires arbitration of the type of claims employees bring against employers. We disagree with this characterization of the agreement. The DRA states it applies to not only disputes about compensation, breaks and rest periods,

22

termination, and harassment, but also to claims INO could bring against an employee regarding trade secrets and unfair competition. The DRA does not exclude any of INO's claims against its employees. (Cf. *Stirlen v. Supercuts, Inc.* (1997) 51 Cal.App.4th 1519, 1528 [the arbitration agreement was substantively unconscionable where it excluded the employer's claims relating to the protection of the employer's intellectual and other property and the enforcement of a postemployment covenant not to compete, which were to be litigated in state or federal court].)

Plaintiffs assert that the DRA's lack of mutuality is illustrated by the fact that despite the DRA, INO can still seek injunctive relief from a court when the employee violates " 'In-N-Out Burgers' Associate Confidentiality and At-Will Employment Agreement' " (an agreement separate from the DRA at issue on appeal). In the event of breach, the confidentiality agreement states that INO " 'may apply to any court of law or equity having jurisdiction for injunctive relief' " because monetary damages would not effectively remedy the violation.

The injunctive relief provision that plaintiffs take issue with is not even part of the DRA. Rather, it is found in INO's "At Will Employment Agreement," which Valadez signed in 2007, years before she signed the DRA in 2013. (The record does not contain such an agreement signed by Lara.) As it was not contemporaneously executed, we do not construe the DRA and At Will Employment Agreement together, and the latter is not a consideration in our unconscionability analysis of the DRA. (See Alberto v. Cambrian Homecare (2023) 91 Cal.App.5th 482, 491 [construing an arbitration agreement and confidentiality

23

agreement together pursuant to Civil Code section 1642 because they were contemporaneously executed].)

Citing *Viking River Cruises, Inc. v. Moriana* (2022) 596 U.S. __, __, 142 S.Ct. 1906 (*Viking River*), plaintiffs also argue the arbitration agreement is substantively unconscionable because it requires plaintiffs " 'to bring any dispute in arbitration on an individual basis only, and not on a . . . private attorney general basis.' . . . Employers may not force employees to waive their right to bring a Private Attorney General Act [PAGA] claim."

In *Viking River*, the United States Supreme Court reviewed an unconscionability challenge to an employment contract with an arbitration provision specifying that "in any arbitral proceeding, the parties could not bring any dispute as a class, collective, or representative PAGA action. It also contained a severability clause specifying that if the waiver was found invalid, any class, collective, representative, or PAGA action would presumptively be litigated in court. But under that severability clause, if any 'portion' of the waiver remained valid, it would be 'enforced in arbitration.' " (*Viking River, supra,* 596 U.S. at p. __, 142 S.Ct. at p. 1916.) Considering our state law rule articulated in *Iskanian, supra,* 59 Cal.4th 348, which prohibited the wholesale waiver of PAGA claims, the *Viking River* court held that the contract's severability clause applied and the FAA compelled enforcement of the arbitration agreement as to the plaintiff's individual Labor Code claims. (*Id.* at pp. __, 142 S.Ct. at pp. 1922–1925; see *Adolph v. Uber Technologies, Inc.* (2023) 14 Cal.5th 1104, 1113–1114.)

Like in *Viking River*, the DRA contains a severability clause, which states: "The Class Action Waiver and Private

24

Attorney General Waiver, and any other provision of this Agreement, shall be severable in any case in which the dispute is filed as an individual action and severance is necessary to ensure that the individual action proceeds in arbitration." Thus, as in *Viking River*, the DRA's PAGA waiver is severable from the arbitration agreement, which remains enforceable against plaintiffs' individual claims.

Based on the foregoing, we conclude plaintiffs failed to show the DRA was substantively unconscionable, which is necessary to find it unenforceable.

## DISPOSITION

The judgment is affirmed. Defendant In-N-Out Burgers is awarded its costs on appeal.


EDMON, P. J.


We concur:



LAVIN, J.



EGERTON, J.

25