Filed 6/16/26  Touhey v. The Regents of the U. of Cal. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| KATHERINE TOUHEY et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>    Defendant and Respondent. | A171325<br><br>(Alameda County<br> Super. Ct. No. 23CV032249) |

Plaintiffs are former members of the University of California, Berkeley (UCB) swim team.  They sued The Regents of the University of California alleging that for years, head coach Teri McKeever was verbally and psychologically abusive and that UCB knew of her conduct and failed to protect plaintiffs from harm.[1]  Plaintiffs appeal from judgment entered after the trial court sustained UCB's demurrer to their first amended complaint (FAC) without leave to amend based on the statute of limitations.  They argue their claims are not barred by the statute of limitations on three

---

[1] The Regents of the University of California are a corporation in the form of a multi-member board with full powers of organization and government over the university.  (*Regents of University of California v. Superior Court* (1999) 20 Cal.4th 509, 514.)  We use "UCB" to refer to the defendant and the school itself.

1

separate grounds: the discovery rule, equitable estoppel, and tolling by fraudulent concealment. Based on the allegations in the FAC, we conclude that the discovery rule applies to postpone accrual of plaintiffs' causes of action until 2022. Plaintiffs timely filed their lawsuit pursuant to that delayed accrual. Accordingly, we reverse and remand.

# I. BACKGROUND

## A. Facts[2]

The 18 plaintiffs[3] were members of the UCB women's swimming and diving team at various times between 2000 and 2020. McKeever was the head coach throughout that period. Plaintiffs were gifted swimmers with extensive competitive experience. When they were being recruited, plaintiffs and their parents were told that McKeever and UCB cared for their success as athletes, students, and young adults. Plaintiffs relied on UCB to provide a safe environment. Instead, they suffered verbal, emotional, and psychological abuse by McKeever.

### 1. Coach-Athlete Power Dynamic

Coaches of elite college athletics maintain a power advantage over the athletes. The coach controls what type of financial scholarship the athlete receives, whether the athlete competes in events, and has an outsize role determining whether the athlete advances to the national team. Because of the power differential, athletes are at risk of psychological, physical, and sexual abuse by their coach. Abusive coaching includes belittling,

---

[2] We take facts from the FAC, attached exhibits, and matters which have been judicially noticed. (See *Rodriguez v. City of Los Angeles* (2025) 116 Cal.App.5th 488, 495.)

[3] 19 plaintiffs filed the FAC. After plaintiff Jenna Rais dismissed her appeal, there are 18 plaintiffs challenging the trial court's judgment.

humiliating, shouting, scapegoating, rejecting, isolating, and threatening. Athletes are trained to endure challenges and become comfortable in discomfort, and they are trained to not complain. Research demonstrates that the normalization of psychologically abusive coaching, along with inactive bystanders, prevents athletes from reporting the conduct. Within a team, conformity is valued and athletes resisting abusive conduct may be painted as dissenters and be ostracized.

This power dynamic makes it difficult for athletes to realize they are victims of abuse. When abusive coaches are backed by large institutions, the athlete cannot easily confront or sever ties with the institution and so they are forced to either ignore or accept abuse to preserve the relationship. They develop coping mechanisms such as becoming " 'blind' " or unaware. When university officials treat abusive conduct as normal, it confirms the athlete's assumption that the behavior is acceptable.

## 2. McKeever's Conduct

McKeever's program "was based on coercion, unquestioning loyalty, public shaming, intimidation, isolation, exclusion, fear, and unsafe training conditions." Her training regime violated national collegiate and league coaching standards and requirements.

McKeever forced swimmers to participate in dangerous training exercises, such as handstands and seal dives. She forced swimmers to train through injuries. While training in Hawaii, McKeever forced swimmers to train and race even after they lacerated their feet on coral or rocks. McKeever designed complicated swim workouts and then berated swimmers who struggled to keep up with the instructions. She forced swimmers to do hypoxic training sets where they felt as though they were being waterboarded and she berated swimmers who surfaced to breathe. One

3

plaintiff was taken to the hospital for a heart scare due to overexertion during training.

McKeever was prone to violent outbursts. She frequently yelled at, mocked, and berated plaintiffs in front of the team and kicked them out of practice for minor things. She often said they " 'looked like shit,' " " 'weren't trying hard enough,' " were a " 'piece of shit,' " and were " 'letting down the team.' " She commented on swimmers' weight, telling them they looked fat. When one plaintiff decided to take a year off to train for the Olympics, McKeever forced the team to berate her. Each season McKeever targeted certain swimmers for degrading treatment, routinely yelling at and attacking them in front of the team. These swimmers on McKeever's " 'shit list' " were abandoned by their teammates and became isolated. When one plaintiff took a break from swimming after being sexually assaulted, McKeever told the team she was weak. When one plaintiff contemplated acting on her suicidal ideations, she texted a teammate who talked her out of it. The next day, McKeever asked, " 'Did you try to kill yourself?' " and then claimed that the plaintiff had ruined the day of the teammate she had asked for help.

McKeever created an atmosphere of fear, paranoia, and anxiety. Plaintiffs feared making mistakes and feared reprisals for things done unrelated to the team, such as weekend social events. McKeever deputized older swimmers to act as her enforcers, who would police the other swimmers and report back to McKeever. When there were tensions with swimmers, McKeever called meetings and went through her list of grievances to build a case why the swimmer was not suited for the team.

During the annual fall off-site retreat, McKeever forced swimmers to share past sexual trauma and she recorded the information in a notebook.

4

Many of her belittling comments throughout the season referenced their specific vulnerabilities.

McKeever exerted control over the swimmers' lives. She held swimmers late after morning practice to yell at them, not caring that they would be tardy for class. She threatened swimmers' scholarships. If a swimmer wanted to transfer schools, they could not cross McKeever because she had the power to release them in the transfer portal. Swimmers who were members of the national team, or aspired to be, were fearful of upsetting McKeever given her involvement with Team USA. She conditioned plaintiffs to seek her approval for everything.

Plaintiffs' stress, intimidation, and fear manifested in physical, emotional, and psychological injuries. The atmosphere caused many swimmers to run out of team meetings or practices to throw up. One plaintiff's epilepsy was affected by stress caused by the environment. Plaintiffs suffered from depression and anxiety, panic attacks, self-doubt, and post-traumatic stress. They had body insecurity and disordered eating due to McKeever's comments about their weight. Many plaintiffs had suicidal ideations. A couple plaintiffs considered getting in accidents so they could get a break from swimming. Ultimately, many plaintiffs quit the team or left UCB entirely. Some plaintiffs stayed on the team for the full four years.

### 3. UCB's Conduct and Knowledge of McKeever's Abuse

UCB was aware of McKeever's abusive conduct as early as 1994 when three team captains met with the athletics director and conveyed their concerns. The athletics director responded that he took their allegations seriously and would monitor McKeever and ensure the program did not continue to be abusive.

5

UCB received direct complaints about McKeever from plaintiffs and/or their parents and were either met with silence or told that she was a good coach. Plaintiffs shared, if at all, a sanitized version of their experiences with their parents, due to fear of retaliation if their parents complained. When parents did reach out to McKeever or other athletics department officials, they were often rebuffed. For example, when one plaintiff's father contacted the athletics director, the athletics director responded dismissively. When one plaintiff transferred to swim at a different university, the athletics director helped her through the transfer process but was not interested in discussing McKeever's conduct. Her mother's calls to UCB's Chancellor were never returned. One plaintiff's father spoke with Jennifer Simon-O'Neill, then the senior associate athletics director, and shared details of McKeever's abusive conduct and how she used team captains to bully his daughter, but Simon-O'Neill showed no reaction. When one plaintiff's parents called athletics director Jim Knowlton, he told them McKeever " 'is a phenomenal coach' " and asked whether they were calling to make a donation.

Several plaintiffs who were no longer on the team were contacted by UCB's Office for the Prevention of Harassment and Discrimination (OPHD) after receiving allegations of misconduct by McKeever. In 2018, one plaintiff and another former swimmer met with three officers and shared their experiences. OPHD later informed the plaintiff that the office had resolved the matter through " 'informal, preventative measure[s],' " discussing with McKeever power dynamics and how words and actions can have a profound impact. In 2020, two other plaintiffs were contacted by OPHD about McKeever's misconduct. One plaintiff left a message with OPHD but never heard back. Another plaintiff informed OPHD that McKeever had harassed

6

and bullied her, resulting in suicidal ideations. She was disappointed "that nothing came of it."

Around 2018, several UCB swimmers submitted a letter to the National Collegiate Athletic Association (NCAA) and the league describing McKeever's abusive atmosphere. These bodies forwarded the letter to UCB, who did not investigate McKeever's conduct or implement a performance improvement plan. In 2022, senior swimmers met with athletics department administrators, including the athletics director, and shared their experiences, including the self-image issues they developed due to McKeever's incessant comments. UCB took no corrective action.

One of UCB's performance evaluations for McKeever, from an unknown year,[4] indicated her supervisor was aware of her abusive and coercive conduct. It noted that McKeever directed personalized attacks at swimmers, students were afraid to go to practice and had a fear of retaliation, and it had gotten worse that year. McKeever's supervisors and the various athletics directors during her tenure were aware of her conduct and took no corrective action. Simon-O'Neill sat in meetings as McKeever berated and threatened plaintiffs and never intervened or admonished her. UCB also had notice of McKeever's conduct from the high attrition rate among swimmers and assistant coaches.

UCB ignored and concealed any complaints about McKeever. It continued to employ her, representing that she was a safe and trustworthy coach. In various ways, UCB communicated to plaintiffs that it had evaluated McKeever's conduct and determined it to be appropriate, professional, and safe, including: holding her out to recruits and students as

_____

[4] The evaluation is attached as an exhibit to the FAC. The year is redacted.

7

trustworthy; allowing her to host off-campus retreats without an administrator attending; allowing her to lead pool deck practices without the supervision of an athletics administrator or lifeguard; allowing her full control over scholarship decisions, competition rosters, and releasing swimmers into the transfer portal; and notifying plaintiffs and other complainants that their inquiries into McKeever's behavior had been resolved.

UCB held McKeever out as a pioneer and " 'maker of Olympians,' " capitalizing on her recognition and publishing pieces praising her in various UCB media outlets. Before the 2008 Olympics, the athletics department distributed a fundraising solicitation with a byline from UCB Olympian Natalie Coughlin, where she praised McKeever. UCB's words and actions continuously communicated to plaintiffs that UCB highly valued McKeever's service and that her coaching style was appropriate, not abusive. In 2014, UCB's Chancellor named McKeever to the search committee for a new athletics director. In 2017, UCB announced the creation of the Teri McKeever Women's Swimming Scholarship. In 2018, UCB inducted McKeever into its Hall of Fame.

By 2020, UCB knew several swimmers had left the team after experiencing depression, anxiety, and suicidal ideations, yet UCB extended McKeever's contract through 2024. In a public statement, the athletics director stated that McKeever was "an iconic coach with an international reputation that is second to none. As much as she develops student-athletes to reach their potential in the pool, [she] also cares deeply about them as individuals and works just as hard to ensure they graduate from [UCB] prepared to be leaders in their post-collegiate careers." The statement

continued, "We look forward to having [McKeever] lead our program for years to come."

### 4. *Orange County Register* **Article**

In May 2022, the *Orange County Register* published an investigative report (the article) alleging years of widespread and continuous abuse by McKeever and inaction by UCB.[5] The article outlined how McKeever mentally, emotionally, and physically abused swimmers, pressured them to train and compete while injured, and directed profanity toward them. A few of the plaintiffs, along with other swimmers, were interviewed for the article. The sources portrayed "McKeever as a bully who for decades has allegedly verbally and emotionally abused, swore at and threatened swimmers on an almost daily basis, pressured athletes to compete or train while injured or dealing with chronic illnesses or eating disorders, even accusing some women of lying about their conditions despite being provided medical records." The article explained that UCB and athletics department officials had received complaints alleging abuse since at least 2014 but ignored them, failed to follow up with the swimmers or their parents, or handled the matter by simply reviewing UCB policies with McKeever.

### 5. **Plaintiffs' Knowledge**

Plaintiffs allege that based on UCB's conduct and statements, they reasonably believed that McKeever's coaching tactics were legitimate and could not have been unsafe or abusive. Plaintiffs were teenagers and

---

[5] The article is not part of the record. The FAC included a website link to the article. In ruling on UCB's demurrer to plaintiffs' initial complaint, the trial court granted plaintiffs' request for judicial notice of the article. Therefore, we will consider the article, which we accessed at the website cited in the FAC. (See *Rodriguez v. City of Los Angeles*, *supra*, 116 Cal.App.5th at p. 495.)

attending UCB was the first time they lived away from home. None of them had experience as a Division I swimmer prior to UCB. They did not have training to determine the difference between challenging coaching and abusive coaching.

Plaintiffs accepted that UCB would not have continued to employ McKeever if her coaching methods were not legitimate. Plaintiffs relied on UCB to evaluate McKeever's conduct and the complaints made about her and to act if her treatment did not adhere to acceptable standards of professionalism and safety. Instead, UCB continued to reward McKeever and promote her as a good coach. UCB concealed complaints about McKeever and suppressed its knowledge of McKeever's misconduct from high school recruits, the NCAA, the U.S. Olympic Committee, and U.S.A. Swimming, causing plaintiffs and other student-athletes to suffer abuse. As a result of UCB's endorsement of McKeever, plaintiffs understood their experiences to be an ordinary part of the elite student-athlete experience and took no further action.

Additionally, prominent swimming organizations endorsed McKeever, further signaling to plaintiffs that their experience was normal and not abusive. McKeever coached Team USA during four Olympics, was inducted into the American Swimming Coaches Association Hall of Fame, and was named to the College Swimming Coaches Association of America's board of directors. Various media outlets, including the *San Francisco Chronicle* and *New York Times*, published flattering media pieces about McKeever.

Plaintiffs allege they could not have reasonably discovered their abuse at an earlier date. It was only after reading the article in 2022 that plaintiffs knew that their claims against UCB had accrued. Through the article, plaintiffs learned that McKeever's abusive conduct was widespread,

10

continuous, and not something they imagined. "Because of their years of training as elite athletes who were pushed not to recognize pain or discomfort, [p]laintiffs had never considered themselves victims of abuse nor had they equated the abuse with their damage." They felt validated that their anguish was not just in their head. For years, they believed they were the problem, not how they were treated by UCB. Based on McKeever's threatening conduct, plaintiffs had been coerced into not talking about the abusive acts they endured. They came forward only due to the media's revelation of her pattern of misconduct and UCB's investigation. Prior to the revelation of McKeever's conduct and UCB's negligence, plaintiffs did not discover UCB's awareness and wrongful concealment of McKeever's pattern of abusive conduct. Only after reading the article did plaintiffs contemplate that the abuse they suffered could form the basis of a legally cognizable claim.

While most allegations pertain to plaintiffs collectively, some plaintiffs also individually address what they knew. Katherine Touhey alleges that until the article was published, she "had never understood Coach McKeever's actions as abuse nor herself as a victim." Even when Touhey began therapy years after graduating, she did not discuss her experiences with McKeever "because she had been convinced by Coach McKeever's narrative that [she] was toxic, was not worthy of being on the team, and that her body failed her." Anina Lund, a team member until 2018, alleges that in spring 2022 a UCB swimmer called her to share how bad the team environment was, which "helped her realize that she in fact wasn't the problem." Anna Kalandadze alleges that "[s]he assumed that she was the problem, unaware that Coach McKeever had a pattern of abusive conduct."

11

### 6. McKeever's Termination

After the article was published, UCB retained an independent law firm to investigate McKeever and determine whether she violated school policies. In January 2023, a report was released concluding McKeever created a hostile environment for swimmers on the basis of race, national origin, and disability. The investigating firm determined that McKeever's persistent use of abusive, insulting, and hostile language violated UCB's policies against bullying and abusive conduct. The report acknowledged that several complaints had been made over the years to UCB, but it did not reach any findings on UCB's handling of them other than to comment that the complaints had been resolved. UCB terminated McKeever on January 31, 2023.

## B. Procedural History

In May 2023, plaintiffs filed a complaint against UCB. UCB demurred to plaintiffs' complaint on the ground that each claim was time-barred. In opposition, plaintiffs argued they adequately pled around a statute of limitations defense under delayed discovery, equitable tolling, and equitable estoppel. The trial court sustained the demurrer. It did so without leave to amend as to application of the discovery rule but with leave to amend to state facts sufficient to establish equitable tolling.

In January 2024, plaintiffs filed the operative FAC alleging four causes of action: negligence, negligent supervision or retention, negligent failure to warn, train, or educate, and negligent infliction of emotional distress. The FAC revised allegations related to the tolling of the statute of limitations. UCB demurred to the FAC, again arguing plaintiffs' claims were barred by the statute of limitations. Plaintiffs opposed, arguing the FAC allegations sufficiently pled facts demonstrating that equitable tolling applied to defeat

12

the statute of limitations defense. The trial court sustained the demurrer without leave to amend, concluding plaintiffs' allegations did not establish equitable tolling. The court subsequently entered judgment of dismissal for UCB.

## II. DISCUSSION

It is undisputed that a two-year statute of limitations applies to plaintiffs' causes of action (Code Civ. Proc., § 335.1) and that more than two years passed between plaintiffs experiencing alleged abuse by McKeever and filing their complaint. Plaintiffs argue their claims are not barred by the statute of limitations based on three separate grounds: the discovery rule, equitable estoppel, and tolling by fraudulent concealment. Because we agree with plaintiffs as to application of the discovery rule,[6] we need not address equitable estoppel or fraudulent concealment.

### A. General Legal Principles and Standard of Review

In reviewing a demurrer, "we independently evaluate the challenged pleading, construing it liberally, giving it a reasonable interpretation, reading it as a whole, and viewing its parts in context." (*Shaw v. Los Angeles Unified School Dist.* (2023) 95 Cal.App.5th 740, 753 (*Shaw*).) "We treat the demurrer as admitting all material facts properly pleaded, but we do not assume the accuracy of contentions, deductions, or conclusions of law." (*Ibid.*; see also

---

[6] We observe that in opposing UCB's demurrer to the FAC, plaintiffs did not assert that the discovery rule applied. Presumably, this is because the trial court had previously sustained UCB's demurrer to the initial complaint without leave to amend as to the discovery rule. While plaintiffs did not raise this argument related to the judgment from which they appeal, we may consider it. (See *Morris v. Redwood Empire Bancorp* (2005) 128 Cal.App.4th 1305, 1316, fn. 4 ["the general rule barring new theories on appeal does not apply to appellate review of a trial court's order sustaining a demurrer"].)

13

*Nolte v. Cedars-Sinai Medical Center* (2015) 236 Cal.App.4th 1401, 1406 ["we accept as true even the most improbable alleged facts, and we do not concern ourselves with the plaintiff's ability to prove its factual allegations"].)

The statute of "limitations period, the period in which a plaintiff must bring suit or be barred, runs from the moment a claim accrues. [Citations.] Traditionally at common law, a 'cause of action accrues "when [it] is complete with all of its elements"—those elements being wrongdoing, harm, and causation.' " (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1191 (*Aryeh*).) There are "equitable exceptions to and modifications of" the limitations rules which "may alter the rules governing either the initial accrual of a claim, the subsequent running of the limitations period, or both." (*Id*. at p. 1192.) One of these doctrines is the discovery rule, which " 'postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action.' " (*Ibid*.; accord, *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807 (*Fox*).) A plaintiff has reason to discover a cause of action when she " 'has reason at least to suspect a factual basis for its elements.' " (*Fox*, at p. 807.) A plaintiff's suspicion of " 'elements' " of a cause of action refers "to the 'generic' elements of wrongdoing, causation, and harm." (*Ibid*.) It is not applied in a hypertechnical approach examining whether the plaintiffs suspect facts supporting each legal element of a cause of action. Instead, "we look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them." (*Ibid*.)

In the context of a demurrer, "to rely on the discovery rule . . ., '[a] plaintiff whose complaint shows on its face that [her] claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery *and* (2) the inability to have made

14

earlier discovery despite reasonable diligence.' " (*Fox*, *supra*, 35 Cal.4th at p. 808.) The burden is on plaintiffs to show diligence and conclusory allegations will not withstand demurrer. (*Ibid*.)

Resolution of the statute of limitations is normally a question of fact. (*Fox*, *supra*, 35 Cal.4th at p. 810.) When the facts are undisputed, application of the statute of limitations is a purely legal question subject to de novo review. (*Aryeh*, *supra*, 55 Cal.4th at p. 1191.) It is difficult for a demurrer based on the statute of limitations to succeed. (*Schmier v. City of Berkeley* (2022) 76 Cal.App.5th 549, 554.) Such demurrer " ' "will not lie where the action may be, but is not necessarily, barred. [Citation.] In order for the bar . . . to be raised by demurrer, the defect must clearly and affirmatively appear on the face of the complaint; it is not enough that the complaint shows that the action may be barred." ' " (*Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 42.)

### B. Analysis

It is undisputed that the elements of plaintiffs' causes of action against UCB were complete more than two years before plaintiffs filed this lawsuit in 2023. That is, between 2000 and 2020, UCB allegedly breached duties it owed to plaintiffs, causing them harm. (See *Aryeh*, *supra*, 55 Cal.4th at p. 1191 [cause of action accrues when elements of wrongdoing, harm, and causation are complete].) Plaintiffs acknowledge their claims are barred unless an exception to the limitations rules applies. As relevant here, they contend that the discovery rule applies to postpone accrual of their claims. To successfully invoke the discovery rule, plaintiffs must plead facts to show (1) the time and manner of discovery, and (2) the inability to have made earlier discovery despite reasonable diligence. (*Fox*, *supra*, 35 Cal.4th at p. 808.) We conclude the allegations in the FAC sufficiently do so.

15

Plaintiffs allege the time and manner of discovery: May 2022 when the article was published. The FAC's allegations demonstrate plaintiffs' inability to have made earlier discovery of wrongdoing—by McKeever and UCB—despite reasonable diligence. Plaintiffs acknowledge that while they were on the team, they knew they were suffering due to McKeever's coaching. But plaintiffs argue they did not know McKeever's conduct was anything other than legitimate, challenging coaching. That is, they did not know McKeever had committed any wrongdoing.

The FAC alleges plaintiffs believed that McKeever's coaching was legitimate and it could not have been unsafe or abusive. This was based on the coach-athlete power dynamic and UCB's conduct. The power dynamic makes it difficult for athletes to realize they are victims of abusive conduct. Plaintiffs were teenagers and attending UCB was the first time they lived away from home. None of them had Division I experience or training to determine the difference between challenging coaching and abusive coaching.

Allegations of UCB's conduct demonstrate that UCB represented, either explicitly or implicitly, that McKeever was a good coach and there was not a problem with her coaching methods. Plaintiffs relied on UCB to provide a safe environment. Since at least 1994—before any plaintiffs joined the team—UCB had notice of McKeever's abusive coaching style. Some plaintiffs or their parents complained, or attempted to complain, to various UCB officials, including the athletics director. They were often met with silence or told that McKeever was a good coach. For example, when one plaintiff transferred to swim at a different university, the athletics director was not interested in discussing McKeever's conduct. When another plaintiff's father shared with Simon-O'Neill details about McKeever's abusive conduct and how she used team captains to bully his daughter, Simon-O'Neill showed no

16

reaction.  Another plaintiff's parents called athletics director Knowlton, who told them McKeever was " 'a phenomenal coach.' "  In 2018 and 2020, a couple plaintiffs who were no longer on the team spoke with OPHD in response to allegations of misconduct by McKeever and shared their experiences.  The inquiries were resolved with McKeever remaining employed.

UCB held McKeever out as a " 'maker of Olympians.' "  It named McKeever to the search committee for a new athletics director in 2014, created a scholarship in her name in 2017, and inducted her into the school's Hall of Fame in 2018.  When UCB renewed McKeever's contract in 2020, the athletics director issued a public statement calling McKeever "an iconic coach with an international reputation that is second to none."  Additionally, prestigious swimming organizations continued to support McKeever.  She was a coach for Team USA during four Olympics between 2004 and 2020.  While plaintiffs do not allege that any entity outside of UCB had notice of McKeever's abusive conduct, the allegations further support plaintiffs' belief that her coaching was legitimate.

Collectively, plaintiffs allege they "did not and could not have reasonably discovered their abuse at an earlier date than they did."  It was not until reading the article in 2022, which described the breadth of McKeever's conduct and UCB's lack of action, that plaintiffs knew or had reason to know their claims against UCB had accrued.  Prior to that, they did not discover, and could not have reasonably discovered, UCB's awareness and wrongful concealment of McKeever's pattern of abusive conduct.  Because of their years of training as elite athletes who were pushed not to recognize pain or discomfort, plaintiffs had never considered themselves victims of abuse nor had they equated the abuse with their damage.  Plaintiffs had believed they

were the problem, not how they were treated by UCB. Only upon reading the article did they contemplate that the abuse they suffered could form the basis of a legally cognizable claim.

Individual plaintiffs also discuss their knowledge. Until the article was published, Touhey "had never understood Coach McKeever's actions as abuse nor herself as a victim." Even in therapy she had not discussed her experiences because McKeever had convinced her she was "toxic" and "not worthy of being on the team." Lund alleges that after she had left the team, a UCB swimmer shared how bad the team environment was, which "helped her realize that she in fact wasn't the problem." Kalandadze "assumed that she was the problem, unaware that Coach McKeever had a pattern of abusive conduct."

We accept these facts as true. (*Shaw*, *supra*, 95 Cal.App.5th at p. 753.) At this stage of the proceedings, the allegations are sufficient to demonstrate, or at least raise as a question of fact, that plaintiffs did not know that McKeever had committed any wrongdoing. It follows, then, that if plaintiffs did not know, or suspect, that McKeever committed any wrongdoing in her coaching methods, then they did not know that UCB had committed any wrongdoing.

Further, for substantially the same reasons as discussed above, the allegations in the FAC are sufficient to demonstrate that plaintiffs did not "have reason to at least suspect that a type of wrongdoing [had] injured them." (*Fox*, *supra*, 35 Cal.4th at p. 807.) That is, they do not demonstrate that plaintiffs would have learned of McKeever's wrongdoing had they conducted a reasonable investigation. (See *id*. at p. 808 ["plaintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have

18

been revealed by such an investigation"].) Instead, read as a whole, the FAC alleges that when inquiries into or complaints about McKeever *were* made to UCB administrators, UCB did nothing, concealed the complaints, represented McKeever as an exemplary coach, or responded years later.

UCB asserts that plaintiffs knew McKeever's conduct was abusive. It contends that plaintiffs were all-star high school swimmers who had endured tough coaching before and "were capable of discerning the distinction between tough coaching and abuse." But plaintiffs allege otherwise. While UCB may attempt to raise these arguments later based on evidence obtained during discovery, given the FAC's allegations, they are unsuccessful at the demurrer stage.

UCB relies on *Mark K. v. Roman Catholic Archbishop* (1998) 67 Cal.App.4th 603, which is distinguishable. There, a priest molested the plaintiff when he was a child. Twenty years later, he sued the church which employed the priest, alleging negligent supervision and fraud. Before the plaintiff was molested, the church was on notice that the priest acted inappropriately with other children and it was foreseeable he would continue to do so. (*Id.* at pp. 606–608.) The plaintiff alleged that it was not until 1996, after one of the priest's survivors made public allegations against him, that the plaintiff became aware that the church was responsible for not protecting him. (*Id.* at p. 608.) The priest had also admonished the plaintiff, causing him to become depressed, fearful, and guilt ridden. (*Ibid.*) The appellate court affirmed the trial court's sustaining of the church's demurrer based on the statute of limitations, rejecting the plaintiff's claim of delayed accrual. (*Id.* at pp. 609, 613, 614.) All elements of negligence were satisfied at the time the plaintiff was molested. (*Id.* at pp. 611–612.) The plaintiff had no basis to disclaim inquiry notice that the church was a potential tortfeasor

19

when he failed "to allege lack of knowledge or appreciation of [the priest's] misconduct." (*Id*. at p. 612.) The plaintiff had not "alleged that he was unaware of the fact that he had been molested by [the priest] or that he failed to appreciate the wrongfulness of [the priest's] conduct until some subsequent event triggered his memory and/or made him realize that [the priest] had acted inappropriately." (*Ibid*.) Here, by contrast, plaintiffs assert those types of allegations.

Both sides rely on unpublished federal district court opinions examining the sufficiency of complaint allegations on motions to dismiss. Plaintiffs rely on *Doe K.G. v. Pasadena Hospital Association, Ltd.* (C.D.Cal., March 16, 2020, No. 18-cv-08710-ODW) 2020 WL 1244357 (*Doe*). UCB relies on *Doe 1 v. National Collegiate Athletic Association* (N.D.Cal., Jan. 4, 2023, No. 22-cv-01559-LB) 2023 WL 105096 (*Doe 1*). While these decisions are not binding, we address the two cases given the parties' reliance on them. (See *People v. Zapien* (1993) 4 Cal.4th 929, 989 [decisions of lower federal courts are not binding on state courts]; *Olinick v. BMG Entertainment* (2006) 138 Cal.App.4th 1286, 1301, fn. 11 [unpublished federal district court cases are citable as persuasive authority].)

In *Doe, supra*, 2020 WL 1244357, the plaintiffs alleged sexual assault and sexual battery against their doctor and the doctor's hospital for the doctor's conduct during exams while they were pregnant. This included inappropriate and unnecessary sexualized touching and lewd and threatening sexualized questions and comments. For example, the doctor made arousal-type sounds, stroked their legs, groped their breasts, touched them excessively, and commented on their vaginas. (*Id*. at pp. *1–*2.) The doctor misrepresented that his acts were for legitimate medical purposes. And, the plaintiffs alleged, the hospital not only failed to take appropriate

20

steps to protect plaintiffs from his misconduct, it actively and deliberately concealed his sexual abuse for years and allowed him to continue practicing medicine. (*Id.* at p. *2.) The plaintiffs argued they only became aware of the doctor's misconduct in 2018, after a newspaper published a story revealing it. (*Id.* at p. *5.) In reviewing the defendants' motion to dismiss, the district court concluded that the discovery rule tolled accrual of plaintiffs' sexual assault and sexual battery claims. (*Id.* at pp. *5–*6.) The complaint allegations did not demonstrate that plaintiffs were aware or had reason to suspect the doctor of wrongdoing. (*Id.* at p. *5.) Because the doctor misrepresented to the plaintiffs that his acts were for a legitimate medical purpose and/or conformed to accepted medical practice, their failure to discover his wrongdoing was reasonable. (*Id.* at p. *6.) Because "reasonable minds could draw more than one conclusion from the allegations, . . . the issue of belated discovery [was] a question of fact." (*Ibid.*) The court did, however, conclude that the discovery rule did not toll the statute of limitations for the sexual harassment claim, reasoning that the plaintiffs should have suspected wrongdoing based on the doctor's sounds and comments. (*Id.* at p. *5.)

In *Doe 1*, *supra*, 2023 WL 105096, the plaintiffs were former members of the University of San Francisco baseball team. They alleged that the head and assistant coaches created a sexualized environment: they got naked on the field, made players strip when they made mistakes, mimed and discussed sexual acts, sexualized the females on campus, gave out sex toys, and berated and punished players who did not participate. (*Id.* at pp. *1–*3.) The players experienced it as an intolerable sexual environment and discussed how to stop the behavior and report it, but they feared retaliation. (*Id.* at p. *4.) The university knew of the conduct but failed to prevent the abuse. (*Id.* at

21

pp. *4–*5.) In 2022, the local newspaper published an article about the case after the university investigated the coaches. (*Id*. at p. *12.) The players sued the university for allowing the behavior to persist. (*Id*. at p. *1.)

The district court dismissed the claims of the nine plaintiffs who were on the team between 1999 and 2018, that is, outside the two-year limitations period. (*Doe 1*, *supra*, 2023 WL 105096 at pp. *1, *12.) It concluded the discovery rule did not apply to toll accrual of their claims. (*Ibid*.) The plaintiffs argued they did not learn about their claims until the 2022 newspaper article, which they likened to survivors of sexual abuse who take years to acknowledge and understand their harm. But the court disagreed. It reasoned that "the plaintiffs knew about the wrongful conduct when it occurred: they allege that they were humiliated, isolated, threatened, destroyed, and uncomfortable. The coaches' misconduct caused them to leave the team or transfer to another school." (*Id*. at p. *12.) The court concluded the abuse was unlike the trauma and suppression of memories which victims of physical sexual abuse may experience, resulting in their denial and lack of understanding of legal rights. (*Ibid*.)

To the extent we find these opinions persuasive, the allegations here more resemble *Doe* than *Doe 1*. In *Doe*, *supra*, 2020 WL 1244357, the complaint did not demonstrate the plaintiffs were aware of, or had reason to suspect, the doctor's wrongdoing. (*Id*. at p. *5.) The doctor misrepresented to the plaintiffs that his acts were for a legitimate medical purpose or conformed to accepted medical practice. (*Id*. at p. *6.) Similarly, here, plaintiffs' allegations demonstrate they did not know McKeever's coaching constituted a wrongdoing. Moreover, they allege that UCB's conduct represented to them that McKeever's coaching was legitimate, not abuse.

22

*Doe 1*, *supra*, 2023 WL 105096, is distinguishable. There were no allegations that the plaintiffs did not know the coaches' conduct was wrong. Nor were there allegations that they relied on representations, actions, or omissions by the university which endorsed the coaches' behavior. Instead, the plaintiffs experienced it as an intolerable sexual environment and discussed how to stop the behavior and report it. And they left the team or transferred schools. (*Id.* at pp. \*4, \*12.) Here, plaintiffs allege that McKeever's threatening conduct coerced them into not talking about her actions. And some of the plaintiffs remained on the team for the full four years.

In sum, liberally construing the FAC as we must (*Shaw*, *supra*, 95 Cal.App.5th at p. 753), plaintiffs have alleged that until the article was published, they did not know and did not have reason to suspect that their experiences suffering under McKeever were anything other than enduring legitimate, challenging coaching. That is, they did not know McKeever committed any wrongdoing. The detailed pleadings describe a closed environment and conduct that, for these athletes, obscured the boundary where coaching became abuse. We are not prepared to say, as a matter of law at this stage, the article could not have triggered the context and shift in realization that plaintiffs claim. If they did not know or suspect there was any wrongdoing by McKeever, then they could not have known there was any wrongdoing by UCB. Accordingly, because plaintiffs' claims are not necessarily time-barred based on the FAC allegations, the demurrer must be overruled. (See *Committee for Green Foothills v. Santa Clara County Bd. of Supervisors*, *supra*, 48 Cal.4th at p. 42; see also *Stella v. Asset Management Consultants, Inc.* (2017) 8 Cal.App.5th 181, 193 [application of the delayed discovery rule is generally a question of fact, properly decided as a matter of

23

law only if the allegations in the complaint and facts subject to judicial notice can support only one reasonable conclusion].)

## III.   DISPOSITION

The judgment is reversed.  On remand, the trial court must vacate its June 12, 2024 order sustaining UCB's demurrer to the FAC without leave to amend and enter a new order overruling the demurrer.  Plaintiffs are entitled to their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)


_____

LANGHORNE WILSON, J.


WE CONCUR:


_____

BANKE, Acting P. J.


_____

SMILEY, J.


*Touhey et al. v. The Regents to the University of California / A171325*

**CONCURRING OPINION OF BANKE, J.**

Although I have signed onto the opinion, I write separately to observe that this case does not fit neatly within the delayed discovery rule of accrual. Rather, the statute of limitations problem presented by this case is similar to that with which the courts grappled for years in the context of claims of childhood sexual abuse. In that context, as here, alleged abuse occurred years, often decades, before the plaintiff filed suit against the alleged perpetrator and/or entity that allegedly should have, but failed, to protect them from the abuse.

Thus, there is distinct tension in this case between the policies underlying statutes of limitations—the need for certainty in one's affairs and recognition of a defendant's right to defend against extremely serious accusations where evidence likely has been lost, memories have faded, and witnesses can no longer be found—and the strong policies supporting the vindication and compensation of young victims of abuse at the hands of those who should have protected them. (See *Lent v. Doe* (1995) 40 Cal.App.4th 1177, 1186 (*Lent*).)

In the mid-1980's the Legislature began recrafting the statutes of limitations and enacted revival statutes applicable specifically to childhood sexual abuse claims. (See generally *Quarry v. Doe I* (2012) 53 Cal.4th 945, 960–970 (*Quarry*) [overview of statutory provisions from 1972 to 2002; "ultimately the Legislature substituted its own rules for the common law discovery rule"].) These statutes are relatively detailed and in large part now eliminate limitations periods. (Code of Civ. Proc., §§ 340.1, 340.11.) The Legislature has not, however, taken any action with respect to cases like this

1

one, involving alleged coaching abuse of student athletes but abuse that was not sexual in nature.

We are thus left with the vagaries inherent in applying the delayed discovery rule in a context that is particularly troubling and elusive, as were the courts that dealt with childhood sex abuse cases in the early years when the Legislature had just begun to enact legislation governing statute of limitations issues in that area.  (See *Evans v. Eckelman* (1990) 216 Cal.App.3d 1609, 1619 (*Evans*) [calling the "state of the law in this area" "unsettled"]; see, e.g., *Snyder v. Boy Scouts of America, Inc.* (1988) 205 Cal.App.3d 1318, 1324 (*Snyder*) [where plaintiff was aware he was being molested by scout master and quit scouts to avoid him, delayed discovery rule did not apply; court rejected argument that because the plaintiff suffered from PTSD, he suffered a "disability" for purposes of statutory tolling]; *DeRose v. Carswell* (1987) 196 Cal.App.3d 1011, 1015, 1018–1019 (*DeRose*) [where plaintiff was aware she was sexually assaulted by her step-grandfather, court ruled she was necessarily aware she was injured and therefore delayed discovery rule did not apply; court rejected argument that discovery rule should apply because she allegedly did not discover the full extent of her injuries and their cause due to psychological mechanisms to " 'deny, repress, and dissociate herself' " from the traumatic events until she started undergoing therapy].)

[1] Indeed, the instant context involving alleged coaching abuse is arguably more troubling than the context of child sexual abuse because sexual abuse is likely more readily definable than coaching abuse.

---

[1] *Evans, Synder*, and *DeRose* have been superseded by Code of Civil Procedure section 340.1 as stated in *Quarry, supra*, 53 Cal.4th at page 963

In any case, under the reasoning of two of the earliest child sex abuse cases—*DeRose* and *Snyder*—I would be hard pressed to conclude plaintiffs here can avail themselves of the discovery rule. They were fully aware, at the time it occurred, of the coach's allegedly harsh conduct. They were fully aware, at the time, that that conduct was hurtful to them, with consequential physical, emotional, and psychological ramifications. They were fully aware, at the time, that either they, themselves, left the athletic program and/or other teammates left the program to avoid being further subjected to any such conduct by the coach. And they were fully aware, at the time, that other university personnel were aware of the coach's conduct but took no action against her.

However, other early childhood sex abuse cases suggest a more expansive application of the discovery rule. For example, in *Sellery v. Cressey* (1996) 48 Cal.App.4th 538 (*Sellery*), the applicable limitations period provided that any childhood sex abuse claim had to be brought within three years of when the plaintiff discovered or reasonably should have discovered that later psychological injuries were caused by the abuse. (*Id.* at p. 544.) The court concluded an allegation that " 'disassociation' " had prevented the plaintiff from " 'fully understanding' " the sexual abuse allegedly perpetrated by her parents, raised a triable issue as to when the plaintiff should have discovered the connection between the abuse and her subsequent psychological injuries. (*Id.* at pp. 547–548.)

The court explained that the plaintiff "offered expert psychological testimony . . . showing that she had used various defense mechanisms, such as 'dissociation, rationalization, and an extreme process of self-blaming and

and *Tietge v. Western Province of the Servites, Inc.* (1997) 55 Cal.App.4th 382, 385.

3

self-shaming as a defense against having full and conscious awareness of the ways in which such abuse had damaged her as an adult. . . .' Another expert . . . opined that [the plaintiff's] 'use of dissociation as a defense against fully understanding and remembering this abuse prevented her, until her recent therapeutic work beginning in 1991, from . . . connecting that abuse with her present psychological injuries.' " (*Sellery, supra,* 48 Cal.App.4th at pp. 547–548.) These opinions, said the court, "created a triable issue of fact as to the time when [the plaintiff] should have discovered the connection between her abuse and injuries." (*Id.* at p. 548.)

The court in *Evans, supra,* 216 Cal.App.3d 1609, took a similar view. The applicable limitations period in that case was three years from the alleged sexual abuse, subject to minority tolling. (*Id.* at p. 1613.) The plaintiffs sued their abuser (their uncle by marriage and foster parent) nearly 20 years after the abuse stopped. (*Id.* at pp. 1612–1613.) They alleged, in pertinent part, "[a]s a result of the abuse, the secrecy, and the violation of their trust, [they] developed various 'psychological blocking mechanisms,' including 'fear, internalized shame, guilt and self blame, confusion, denial, repression and disassociation from the experience of abuse.' They were consequently unable to perceive the psychological injuries caused them or their causal connection to [the abuser's] acts." (*Id.* at p. 1613.) They also argued, but had not alleged in their complaint, that these blocking mechanisms "prevented them from knowing the wrongfulness of the acts done to them." (*Id.* at p. 1617.)

The court concluded the plaintiffs were entitled to an opportunity to plead and prove that, at the time, they had not understood the wrongfulness of the defendant's conduct and thus could bring the case within the discovery rule. (*Evans, supra*, 216 Cal.App.3d at p. 1619.) "It has been widely

4

recognized," said the court, "that the shock and confusion engendered by parental molestation, together with the parent's demands for secrecy, may lead a child to deny or block the traumatic events from conscious memory, or to turn the anger and pain inward so that the child blames himself or herself for the events." (*Id.* at p. 1615.) "Plaintiffs here alleged that among the 'blocking mechanisms' caused by the abuse were 'internalized shame, guilt and self blame.' Construed liberally these allegations might show plaintiffs' unawareness *at the time of the abuse* that defendant was acting wrongfully." (*Id.* at p. 1619.)

But the plaintiffs' allegations did not, said the court, "indicate how long that ignorance of wrongfulness continued. For plaintiffs to prevail they must be able to show they remained unaware of, and had no reason to suspect, the wrongfulness of the conduct until a time less than three years before this action was filed." (*Evans, supra*, 216 Cal.App.3d at p. 1619.) They were therefore entitled to an opportunity to amend their complaint to add such allegations if they were able to do so. (*Ibid.*; cf. *Mark K. v. Roman Catholic Archbishop* (1998) 67 Cal.App.4th 603, 612 & fn. 9 [discovery rule did not apply where the plaintiff did not allege that he "failed to appreciate the wrongfulness of [the priest's] conduct until some subsequent event triggered his memory and/or made him realize that [he] had acted inappropriately," citing *Sellery* and *Evans* as earlier cases that "permitted the statute of limitations to be tolled until such time as the victim was able to appreciate the wrongfulness of the abuser's conduct"].)[2]

_____

[2] As the opinion discusses, the analysis in *Doe K.G. v. Pasadena Hospital Association, Ltd.* (C.D.Cal., Mar. 16, 2020, No. 2:18-cv-08710-ODW) 2020 WL 1244357 (*Doe*) is similar. In that case, the patients of an obstetrician-gynecologist alleged the physician sexually assaulted and battered them, as well as many other patients. They sued the hospital for

5

I am satisfied that under the reasoning of *Evans,* plaintiffs' allegations "[c]onstrued liberally" (*Evans, supra,* 216 Cal.App.3d at p. 1619) suffice to make "the issue of belated discovery a question of fact." (*Doe, supra,* 2020 WL 1244357 at p. *6.) And it is an issue of fact as to each plaintiff individually. (*Evans,* at p. 1619.)

I lastly observe that given the Legislature's exacting consideration of the interests that weigh in the balance when it comes to statutes of limitations in the context of childhood sexual abuse claims, such consideration may also be warranted in the equally, if not more, challenging context of coaching abuse claims brought against educational institutions years later by former student athletes. (Compare *Doe 1 v. National Collegiate Athletic Association* (N.D.Cal., Jan. 4, 2023, No. 22-cv-01559-LB) 2023 WL 105096 [college students subjected to alleged coaching abuse could not invoke discovery rule].)

---

failure to prevent the misconduct. (*Id.* at p. *5.) The defendants asserted the plaintiffs were aware of the conduct at the time it occurred and therefore their claims were untimely under the applicable statute of limitations. (*Id.* at p. *6.) The plaintiffs maintained their claims were timely under the discovery rule. The district court agreed with the plaintiffs—one, they claimed they did not become aware that the physician's conduct was wrongful until a "Los Angeles Times published a story describing [his] sexual misconduct," and two, the physician had "misrepresented to Plaintiffs that his 'acts were for a legitimate medical purpose and/or conformed to accepted medical practice.'" (*Ibid.*) Thus, "reasonable minds could draw more than one conclusion from the allegations," making "the issue of belated discovery" a "question of fact." (*Ibid.*)

6